2020 IL App (2d) 170963
No. 2-17-0963
Opinion filed August 10, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-187 |
| DANIEL E. PERKINS, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Presiding Justice Birkett and Justice Brennan concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial, defendant, Daniel E. Perkins, was found guilty of aggravated kidnapping with a firearm (720 ILCS 5/10-2(a)(6) (West 2014)), two counts of aggravated criminal sexual assault with a firearm (720 ILCS 5/11-1.30(a)(8) (West 2014)), attempted aggravated criminal sexual assault with a firearm (720 ILCS 5/8-4(a), 11-1.30(a)(8) (West 2014)), and armed violence (720 ILCS 5/33A-2(a) (West 2014)). The court sentenced defendant to an aggregate of 52 years in prison. Defendant appeals, arguing that (1) he is entitled to a new trial because two of the State's witnesses testified falsely and (2) the evidence was insufficient to support his conviction of armed violence. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Defendant and K.O. dated for approximately eight months before breaking up around the beginning of June 2015. Over the next few weeks, they discussed the possibility of getting back together. During that time, defendant heard rumors that K.O. had rekindled her relationship with Christopher Kleveno, who was the father of one of her children. Because of defendant's anger with K.O., on June 28, 2015, defendant allegedly forced K.O. at gunpoint to perform sexual acts on him before making her drive him around in her car for approximately two hours. The State charged defendant with aggravated kidnapping with a firearm, two counts of aggravated criminal sexual assault with a firearm, attempted aggravated criminal sexual assault with a firearm, and three counts of armed violence. Prior to trial, the court severed two of the armed violence charges that involved allegations that defendant possessed drugs. The matter proceeded to a bench trial on the remaining five charges.

¶ 4                              A. Overview of the Trial Evidence

¶ 5    We will begin with an overview of the trial evidence. After doing so, we will focus more specifically on the testimony that defendant claims was perjured.

¶ 6    K.O. testified as follows. On June 28, 2015, she went to defendant's house to pick up some personal belongings. Once she entered the house, defendant pointed a gun at her head and told her to call Kleveno from her cell phone. Defendant and Kleveno exchanged heated words over the phone, and K.O. told Kleveno that defendant had a gun. After the phone call, defendant threw K.O. into a stove when she attempted to grab her phone from him. Defendant also cocked his gun so that it ejected three bullets onto the kitchen floor. Defendant then told K.O. to "take care of him" sexually. She complied, and defendant held the gun in his hand during that activity. Immediately thereafter, K.O. received a call from her aunt, who, in the meantime, had received a call from Kleveno. K.O. picked up the phone, told her aunt that she was fine, and said that she

had to call her aunt back. Defendant then told K.O. that they were going to leave his house and that he had somewhere to take her. As they walked from defendant's house to K.O.'s car, defendant had the gun in his hand and was "kind of *** waving it around." K.O. got into the driver's seat of her car, and defendant got into the front passenger's seat.

¶ 7    According to K.O., defendant told her where to drive and she followed his instructions. At defendant's direction, she called Kleveno again from her phone while she and defendant drove around. After that conversation, defendant threw K.O.'s phone out of the passenger's side window at an intersection. Defendant continued to threaten K.O. in the car, including by putting the gun to her head. Over the next two hours, defendant told K.O. to stop at a gas station, a forest preserve, and another gas station. At the first gas station, defendant followed K.O. into the women's bathroom. Although defendant threatened K.O. multiple times during this ordeal, she eventually was able to placate him by kissing him, holding his hand, and assuring him that they would get back together. Defendant threw his gun into a lake in the forest preserve. After stopping at the second gas station, K.O. and defendant drove back to defendant's home, where a police officer was waiting (Kleveno had contacted the authorities). Defendant was arrested without incident.

¶ 8    Multiple witnesses—including police officers, Kleveno, and K.O.'s aunt—testified that K.O. appeared traumatized in the immediate aftermath of these events. Police officers testified that K.O. initially was reluctant to tell them everything that had happened, expressing fears that defendant would retaliate against her family. K.O.'s aunt corroborated K.O.'s testimony about their brief phone conversation on June 28, 2015. Kleveno corroborated K.O.'s testimony about his phone conversations with K.O. and defendant on June 28.

¶ 9    Upon searching defendant's home, the police found three unfired bullets on his kitchen floor and an open gun case on his bedroom floor. The police located K.O.'s phone approximately

40 feet off the road where K.O. said that defendant had thrown it out of the car. K.O. accompanied police officers to the location in the forest preserve where defendant threw his gun into the water. Divers recovered defendant's gun at that location.

¶ 10    When the police questioned defendant on the night of the incident, he denied having sexual contact with K.O. for several weeks. However, a swab of defendant's penis revealed the presence of deoxyribonucleic acid (DNA) other than his own. K.O. could not be excluded as the contributor of that DNA. The State introduced evidence that defendant may have attempted to tamper with this test after a police officer requested a DNA swab of defendant's penis. In this respect, the State's evidence came from a police officer's interpretation of what he saw on the surveillance video from the booking room. We have reviewed the relevant portion of the surveillance video. Because of the angle of the camera, it is difficult to tell what happened. Nonetheless, it does appear that defendant, while seated at a table, put his right hand down his pants after that hand had been near his mouth. At trial, defendant acknowledged that he put his hand down his pants at the police station. He said that he did so not to tamper with the DNA test but because it was cold in the police station.

¶ 11    The State also introduced evidence that, while defendant was awaiting trial at the Kendall County jail, he solicited a fellow inmate to kill K.O. Defendant arranged for one of his friends to post bond for that inmate.

¶ 12    Defendant testified in his defense as follows. While K.O. was at his house on June 28, 2015, he wanted to speak with Kleveno on the phone to clear up rumors that K.O. was engaged to Kleveno. Defendant and Kleveno got into an argument over the phone, and Kleveno threatened to come over to defendant's house and "beat the s***" out of him. After that phone conversation, defendant went into his bedroom to change his shirt. K.O. followed him, apologized, and

embraced him. They had "passionate makeup sex" but he was unable to get an erection. Defendant acknowledged lying to police officers when he told them that he did not have sexual contact with K.O. on June 28.

¶ 13    Defendant insisted that he did not retrieve his gun until after he and K.O. had sexual contact. Defendant testified that, because Kleveno had threatened him and he "didn't want any trouble," he grabbed his gun before he and K.O. left the house. Asked to explain the three bullets that were found on his kitchen floor, defendant said that "the gun was really not functioning properly," so he "slid the gun a couple times and it ejected the bullets out of the gun."

¶ 14    Defendant testified that he and K.O. decided to take her car for a drive because his car was blocked. In defendant's words:

> "She wanted to get in the car. She said that she was starving. She hadn't aten [*sic*] anything all day. She couldn't get out of the house fast enough with me."

Once they got in K.O.'s car, she asked him where to go, and he told her to head out of town. Defendant told K.O. to call Kleveno again from the car. Defendant thought that, during the earlier phone conversation, K.O. did not make a good attempt to clarify whether she and Kleveno were engaged. Defendant then got into another argument with Kleveno, during which Kleveno said that he had called the police. Defendant threw K.O.'s phone out of the car window. Defendant admitted lying to police officers when he told them that K.O. threw her phone out of the window.

¶ 15    Defendant testified that he and K.O. went to two gas stations and a forest preserve. Defendant acknowledged that he followed K.O. into the bathroom at one of the gas stations, but he added that it was "[n]ot uncommon" for him to do that. He admitted throwing his gun into the lake at the forest preserve. He claimed that he did so because he "wasn't going home with a weapon," knowing that Kleveno had called the police. Defendant maintained that he never

threatened K.O. on June 28, 2015, and that he never made her go anywhere that she did not want to go. The State introduced evidence of defendant's prior felony conviction to impeach his credibility.

¶ 16    Two of defendant's neighbors testified for the defense. They were in their garage on June 28, 2015, and they had a clear view of defendant's house. They did not notice anything unusual. One of the neighbors saw defendant getting into K.O.'s car but did not notice a gun in defendant's hands. That neighbor, however, did not see defendant walk from his house to K.O.'s car.

¶ 17    Defendant also called to the stand an employee of the first gas station where he and K.O. stopped on June 28, 2015. That witness testified that she did not notice anything out of the ordinary.

¶ 18    Defendant called to the stand a police officer, who testified that K.O.'s aunt told him that K.O. had called *her* on June 28, 2015—not the other way around, as K.O. and the aunt testified.

¶ 19     Another officer testified for the defense about his unsuccessful efforts to procure copies of the surveillance videos from the two gas stations. That officer had the opportunity, however, to view the surveillance video from the second gas station. He noticed that the video depicted a man wearing a Cubs jersey who was by himself at the counter. Other evidence introduced at trial showed that defendant was wearing a Cubs jersey on June 28, 2015.

¶ 20             B. Trial Testimony Regarding K.O.'s Relationship with Kleveno

¶ 21    Because K.O.'s and Kleveno's testimony about the nature of their relationship in June 2015 is one of the focal points of this appeal, it is necessary to further address this aspect of the evidence.

¶ 22    K.O. testified on direct examination by the prosecutor that, as of the time of trial, she shared a residence with Kleveno. Kleveno watched her children, including a daughter whom she and

Kleveno had together before June 28, 2015. The prosecutor had the following colloquy with K.O. about her relationship with Kleveno:

> "Q. You said that the relationship [with defendant] had stopped or broken down at least three weeks prior to June 28th?
>
> A. Yes.
>
> Q. Did you during that time frame start—did you see anyone else during that time frame?
>
> A. No.
>
> Q. Did you find out that people—that someone thought that you were seeing someone else?
>
> A. Yes."

At this point, K.O. explained that a coworker of hers named Lydia was fired and then "made contact with other people" about K.O. K.O. learned about this from defendant. Specifically, defendant told K.O. that Lydia contacted him and said that K.O. had been "seeing" Kleveno, and that this had been ongoing for K.O.'s and defendant's "whole relationship." The following exchange then occurred:

> "Q. Was that true?
>
> A. No.
>
> Q. Had you seen [Kleveno] during the relationship [with defendant]?
>
> A. I had seen him, yes, but—
>
> Q. Physically saw him?
>
> A. Correct.

Q. You had a daughter in common and sometimes he would watch the kids and sometimes you would watch the kids?

A. Right.

Q. But you did not have a romantic relationship with [Kleveno]?

A. No."

¶ 23    On cross-examination, defense counsel questioned K.O. about her relationship with Kleveno:

"Q. You had been dating [defendant] for about eight or nine months prior to this June 28th incident, correct?

A. Yes.

Q. Prior to that, you actually had a child with [Kleveno], correct?

A. Yes.

***

Q. And on June 28th or 27th, you were still living with [Kleveno]?

A. We weren't living together.

***

Q. Were you staying with him then?

A. I stayed at his house occasionally.

Q. And did you stay at his house the 26th, the night of the 26th of June?

A. 26th of June?  Yes, I did.

Q. And during that time you were still texting with [defendant]; is that correct?

A. Yes.

Q. And you were going back and forth about your relationship with [Kleveno] versus your relationship with [defendant]; is that correct?

A. Right.

***

Q. During this texting [with defendant] on the 27th of June?

A. Right.

Q. Were you and [defendant] discussing your relationship, correct [*sic*]?

A. Yes.

Q. And part of that was your relationship with [Kleveno] as well, correct?

A. Yes.

Q. And [Kleveno] was essentially saying, hey, just make up your mind, pick one of us, correct?

A. Right.

Q. [Kleveno] said, hey, could work out for you, [K.O.'s and Kleveno's daughter] being with her dad, right?

A. Yes.

Q. Through this, there was some emotions going back and forth on both of you, correct?

A. Right.

Q. At some point [defendant] was saying, hey, just leave me alone, don't talk to me anymore, correct?

***

A. Yeah.

Q. You actually would call [defendant] back saying, hey, I want to work it out, I want to talk to you, I still love you, correct?

A. Yes."

¶ 24 Kleveno testified as follows on direct examination by the prosecutor:

"Q. Who do you live with currently?

A. [K.O.]

Q. What is your relationship with [K.O.]?

A. She is my daughter's mother.

Q. And how long have you known [K.O.]?

A. Ten years.

Q. And considering that she's your daughter's mother, you guys had an intimate relationship at one point; is that correct?

A. Yes.

Q. How long were you in a relationship with her for?

A. Four years.

Q. What is the status of your relationship with her now?

A. Communal living, pretty much living together taking care of the kids, regular life type thing, I guess."

When the prosecutor subsequently asked Kleveno about the status of his relationship with K.O. on June 28, 2015, the following colloquy ensued:

"A. Just she had dropped off our daughter every other weekend, so what would you call that?

Q. Did you have an amicable relationship at that time?

A. Yeah.

Q. And was she living with you at that time?

A. No."

¶ 25 On cross-examination, Kleveno testified as follows:

"Q. Now, you and [K.O.] had a dating relationship obviously prior to this event, correct?

\*\*\*

A. Yes.

Q. [W]ould you say your relationship was on and off throughout this period of time?

A. Prior to this?

Q. Yes.

A. No. We broke up before her and [defendant] started dating and that was the end of it.

Q. You had broken up eight, nine months prior to this?

A. Yes.

Q. You are now living together today, correct?

A. Correct.

Q. I think you said you called that communal living.

A. Yes.

Q. You have a daughter; is that correct?

A. Correct.

Q. Now—so you see her [presumably, K.O.] on a daily basis at this time?

A. Correct.

Q. You're able to talk about your lives and the case and what's going on here today, correct?

A. Correct."

¶ 26                                    C. Findings of Guilt

¶ 27    The court found defendant guilty of all five charged offenses that proceeded to trial. In explaining its ruling, the court commented that it found various witnesses, including K.O. and Kleveno, credible. The court did not deem defendant's testimony "sufficiently credible."

¶ 28                                    D. Posttrial Motion

¶ 29    Defendant filed a timely posttrial motion. He thereafter hired new counsel who, with leave of court, supplemented the posttrial motion three times. The only claim in defendant's posttrial motion that is relevant to this appeal is defendant's allegation that K.O. and Kleveno perjured themselves when they testified about the status of their relationship in June 2015. To establish his allegations of perjury, defendant relied heavily on text messages between K.O. and Kleveno, which were obtained through an extraction of K.O.'s phone (the prosecutor had tendered this extraction report to defense counsel prior to trial). Those text messages showed that K.O. and Kleveno had a romantic and sexual relationship in the weeks leading up to June 28, 2015, which was around the same time that K.O. was contemplating getting back together with defendant. According to defendant, the prosecutor had a duty to bring K.O.'s and Kleveno's false testimony to the court's attention. Alternatively, defendant argued that his trial counsel was ineffective for failing to cross-examine K.O. and Kleveno regarding these text messages. In that light, defendant requested a new trial.

¶ 30    The court held a lengthy evidentiary hearing on defendant's posttrial motion. Most of the evidence is not relevant to the issues on appeal. Matthew Hale, a private investigator hired by the

defense, testified that he "recently" spoke with Kleveno on the phone. Kleveno told Hale that (1) Kleveno was engaged to K.O. (presumably, at the time of Hale's phone conversation with Kleveno), (2) Kleveno and K.O. were in a sexual relationship as of February 2015, (3) Kleveno and K.O. had an ongoing romantic and sexual relationship, including when they were living together, and (4) Kleveno and K.O. were in a romantic and sexual relationship before and after the incident with defendant.

¶ 31    Defendant's trial counsel testified at the posttrial motion hearing that he believed that he had reviewed the extraction report of K.O.'s phone prior to trial. He said that the nature of K.O.'s and Kleveno's relationship was not a "big focus" of his trial theory; instead, he focused on the fact that neither defendant's neighbors nor the gas station attendant noticed anything out of the ordinary on June 28, 2015.

¶ 32    The trial court denied defendant's posttrial motion. The court determined that "there wasn't enough in Mr. Hale's testimony that would lead the Court to believe that [defendant's trial counsel] was ineffective in his representation of [defendant] throughout the time leading up to the trial and during the trial." The court explained that defendant failed to prove that his trial counsel's representation fell below an objective standard of reasonableness. The court also found that any shortcomings in counsel's performance "were not so serious as to deprive the defendant of a fair trial." Furthermore, the court ruled that there was not a reasonable probability that the result of the trial would have been different but for counsel's unprofessional errors. Focusing specifically on the allegations of perjury, the court said that defendant's allegations did not relate to "material facts." Moreover, there was "not sufficient evidence to show that [K.O.] or Mr. Kleveno actually lied with respect to their testimony," and there was "certainly nothing to indicate that the State knowingly permitted a witness to lie at all."

¶ 33                                    E. Sentencing

¶ 34     The court sentenced defendant on four of the five counts, as the court determined that one of the two counts of aggravated criminal sexual assault with a firearm merged into the other. Defendant was sentenced to an aggregate of 52 years in prison. Specifically, defendant was sentenced to 25 years in prison for aggravated kidnapping with a firearm, to be served consecutively to a 27-year sentence for aggravated criminal sexual assault with a firearm. Defendant received a 7-year sentence for attempted aggravated criminal sexual assault with a firearm and a 17-year sentence for armed violence. Both of those sentences were to be served consecutively to the sentence imposed for aggravated criminal sexual assault with a firearm but concurrently with the sentence for aggravated kidnapping with a firearm.

¶ 35     The court denied defendant's postsentencing motion, and defendant timely appealed.

¶ 36                                    II. ANALYSIS

¶ 37                 A. Due Process/Ineffective Assistance of Counsel

¶ 38     Defendant first argues that the evidence presented at his posttrial motion hearing conclusively established that (1) K.O. and Kleveno were in a romantic relationship in June 2015 and (2) both the prosecution and defense counsel knew or should have known that K.O.'s and Kleveno's trial testimony was false. Accordingly, defendant maintains that he is entitled to a new trial, either based on a due process violation or because he received ineffective assistance of counsel. The State responds that defendant failed to meet his burden to prove that K.O. and Kleveno perjured themselves. The State also contends that trial counsel's strategy was reasonable and that the evidence of defendant's guilt was overwhelming.

¶ 39                                    1. *Due Process*

¶ 40    The State violates due process by obtaining a conviction through use of evidence that its representatives know to be false. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Even where the State does not solicit false evidence, the State may not allow such evidence to "go uncorrected when it appears." *Napue*, 360 U.S. at 269. These principles apply equally where the false evidence goes only to the issue of witness credibility. *Napue*, 360 U.S. at 269. When asserting a due process violation, a defendant bears the burden to establish by clear and convincing proof that the State used perjured testimony in the manner proscribed by *Napue*. *People v. Veal*, 58 Ill. App. 3d 938, 964 (1978). If the defendant meets that initial burden, the State must then "show beyond a reasonable doubt that the perjured testimony did not contribute to [the defendant's] convictions." *Veal*, 58 Ill. App. 3d at 964. "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *People v. Olinger*, 176 Ill. 2d 326, 349 (1997). This is equivalent to the harmless error standard. *Olinger*, 176 Ill. 2d at 349.

¶ 41    The parties dispute the appropriate standard of review. The trial court denied defendant's due process claim following an evidentiary hearing on defendant's posttrial motion. Defendant, relying on *People v. Nowicki*, 385 Ill. App. 3d 53 (2008), asserts that *de novo* review is appropriate. As the State correctly points out, *Nowicki* did not specify the standard of review it applied in its analysis of the alleged use of perjured testimony. Citing *Veal*, the State maintains that the proper inquiry is whether the trial court's decision was "manifestly erroneous." *Veal* indeed supports applying the manifest-weight-of-the-evidence standard of review. *Veal*, 58 Ill. App. 3d at 964. Defendant offers no case law or convincing reason to apply any other standard of review.

¶ 42    Defendant contends that the record clearly establishes that K.O. and Kleveno provided false testimony regarding the status of their relationship in June 2015 and that this false testimony

likely affected the result of trial. The trial court rejected defendant's arguments. For the following reasons, the court's conclusion was not against the manifest weight of the evidence.

¶ 43    In support of his posttrial motion, defendant relied upon text messages between K.O. and Kleveno that contained dialogue suggesting they were engaged in a romantic and sexual relationship after K.O. broke up with defendant in early June 2015. However, when the prosecutor questioned K.O. regarding her relationship with Kleveno, he did not establish a clear timeframe relevant to some of his questions:

> "Q. You said that the relationship [with defendant] had stopped or broken down at least three weeks prior to June 28th?
>
> A. Yes.
>
> Q. Did you *during that time frame* start—did you see anyone else *during that time frame*.
>
> A. No." (Emphasis added).

One could reasonably interpret "that time frame" as referencing the three weeks after K.O. and defendant broke up. One could also reasonably interpret "that time frame" as referencing the period that K.O. dated defendant. It seems likely that K.O. assumed the latter, as she went on to discuss untrue rumors that she was "seeing" Kleveno during her "whole relationship" with defendant. K.O.'s testimony on direct examination is ambiguous regarding the status of her relationship with Kleveno during the three weeks after she broke up with defendant. Nothing in the text messages compels a conclusion that K.O. testified falsely on direct examination.

¶ 44    On cross-examination, K.O. acknowledged that she occasionally stayed at Kleveno's house in June 2015 and that she had discussions with defendant about her relationship with Kleveno. K.O. also acknowledged that Kleveno told her to pick either him or defendant. From our review

of the text messages that defendant relied on in support of his posttrial motion, K.O.'s testimony on these points was consistent with the messages. Significantly, defense counsel never directly asked K.O. whether she had a romantic or sexual relationship with Kleveno in the three weeks after she broke up with defendant. Accordingly, nothing in the text messages compels a conclusion that K.O. testified falsely on cross-examination.

¶ 45     The same holds true for Kleveno's testimony. When the prosecutor asked Kleveno on direct examination about the status of his relationship with K.O. on June 28, 2015, Kleveno responded: "Just she had dropped off our daughter every other weekend, so what would you call that?" Kleveno's answer to this question was nonresponsive and possibly evasive but it was not inconsistent with the text messages that defendant cited in his posttrial motion. Kleveno then testified that he had an "amicable relationship" with K.O. as of June 28 but that she was not living with him then. The text messages suggest that K.O. and Kleveno *contemplated* moving in together in June 2015 and that she sometimes stayed at his house that month. Thus, Kleveno's testimony that he had an amicable relationship with K.O. on June 28 but that they did not live together was consistent with the text messages. Kleveno never explicitly denied having a romantic or sexual relationship with K.O in June 2015.

¶ 46     On cross-examination, defense counsel questioned Kleveno as to whether his relationship with K.O. was "on and off throughout this period of time." Kleveno asked defense counsel: "Prior to this?" Defense counsel responded, "Yes." Kleveno then testified that he and K.O. broke up before K.O. started dating defendant and that "that was the end of it." As was the case with the prosecutor's questioning of K.O., defense counsel's questions of Kleveno were ambiguous as to the timeframe that was relevant to the questions. One could reasonably interpret defense counsel's questions as asking whether Kleveno was romantically involved with K.O. while K.O. was dating

defendant. It appears that Kleveno may have interpreted the questions that way. The text messages that defendant cited in his posttrial motion did not establish that K.O. and Kleveno maintained a romantic relationship while K.O. dated defendant. Thus, nothing in the text messages compels a conclusion that Kleveno testified falsely on cross-examination.

¶ 47    Hale's testimony at the evidentiary hearing on defendant's posttrial motion likewise did not compel a conclusion that either K.O. or Kleveno testified falsely at trial. As noted above, Kleveno allegedly told Hale in a recent phone call that (1) Kleveno was engaged to K.O. (presumably, currently—*i.e.*, at the time of Hale's phone conversation with Kleveno), (2) Kleveno and K.O. were in a sexual relationship as of February 2015, (3) Kleveno and K.O. had an ongoing romantic and sexual relationship, including when they were living together, and (4) Kleveno and K.O. were in a romantic and sexual relationship both before and after the incident with defendant. None of the statements that Hale attributed to Kleveno were irreconcilable with K.O.'s and Kleveno's trial testimony about the status of their relationship in June 2015. Additionally, it seems that the trial court may not have attributed much weight to Hale's testimony, as the court found that defendant did not produce "sufficient evidence" to show that either K.O. or Kleveno lied at trial. The trial court was justified in concluding that the statements that Kleveno made to Hale at some unspecified "recent" time did not amount to clear and convincing evidence that Kleveno and K.O. perjured themselves at trial. Even if the court found Hale's testimony credible, however, Hale's testimony did not show that any representative of the State knew or had reason to know that Kleveno or K.O. testified falsely.

¶ 48    Even if defendant had met his burden to provide clear and convincing proof that the State knowingly offered perjured testimony or knowingly failed to correct perjured testimony, any error was harmless beyond a reasonable doubt. The ultimate question is whether there was "any

reasonable likelihood that the false testimony could have affected the jury's verdict." *Olinger*, 176 Ill. 2d at 349. Given that defendant opted for a bench trial and that the judge who found defendant guilty also handled defendant's posttrial motion, our analysis is straightforward. Obviously, there is no likelihood that the allegedly false testimony would have affected the judge's conclusions at trial, as the judge reviewed the evidence that defendant submitted in support of the posttrial motion and then denied the motion. See, *e.g.*, *People v. Dobbs*, 353 Ill. App. 3d 817, 824 (2004) ("When conducting a bench trial, the trial court is presumed to consider only admissible evidence. *** This presumption is overcome, however, if it affirmatively appears from the record that improper evidence was considered by the court.").

¶ 49     Moreover, it was of marginal relevance, if any, whether K.O. and Kleveno had a romantic or sexual relationship in the weeks after K.O. broke up with defendant. Defendant suggests that this relationship might have provided a motive for K.O. to falsely accuse him. Specifically, defendant asserts that K.O. might have "lied about the incident to convince Kleveno she did not willingly go to defendant's house to rekindle her relationship with [defendant]." It is difficult to reconcile that theory with defendant's assertion elsewhere in his brief that K.O. and Kleveno may have "coordinated their testimony." In one breath, defendant says that K.O. lied to deceive Kleveno; in the next breath, defendant argues that K.O. and Kleveno were in cahoots. Defendant is grasping at straws to show why K.O.'s relationship with Kleveno was relevant to this case.

¶ 50     Assuming that K.O.'s relationship with Kleveno was even marginally relevant, there was already some evidence adduced at trial about what defendant calls a "love triangle." On cross-examination, K.O. admitted that, shortly before the events of June 28, 2015, she and defendant had conversations focusing on her relationship with Kleveno. K.O. also acknowledged that Kleveno told her to choose either him or defendant. Furthermore, the evidence showed that K.O. and

Kleveno lived together at the time of trial. Kleveno even acknowledged on cross-examination that he and K.O. were able to talk about "the case and what's going on here today"—*i.e.* their trial testimony. Thus, even if K.O. and Kleveno were not fully transparent in their trial testimony about the status of their relationship in June 2015, and even if this were a relevant issue, it would not have affected the result of the trial, given that there was already evidence at trial that K.O. found herself in a "love triangle" in June 2015.

¶ 51    Finally, the evidence of defendant's guilt was overwhelming. See *People v. Lucas*, 203 Ill. 2d 410, 423-24 (2002) (the State's use of perjured testimony was harmless error where there was overwhelming evidence of the defendant's guilt); see also *Nowicki*, 385 Ill. App. 3d at 99. Although witness credibility certainly played a large part in defendant's trial, the evidence bearing on that issue was not close. The physical evidence corroborated K.O.'s testimony about defendant sexually assaulting and kidnapping her. For example, the police found K.O.'s cell phone lying in the grass near the side of a road. They also found defendant's gun at the bottom of a lake, three bullets on his kitchen floor, and an open gun case on his bedroom floor.

¶ 52    Although defendant attempted to explain away this damaging evidence at trial, his testimony was inherently implausible. For example, defendant's claim that he and K.O. had "makeup sex" on June 28, 2015, simply makes no sense, as he was in the middle of an argument with K.O. at the time that was so heated that he subsequently felt compelled to throw her cell phone out of a car window. Likewise, it makes no sense that defendant would eject three bullets from his gun in K.O.'s presence if he did not mean to threaten her. Furthermore, defendant admitted that he followed K.O. into the bathroom at one of the gas stations. Although defendant said this was not uncommon for him, it certainly was not consistent with his claim that K.O. acted

entirely of her own volition on June 28, 2015. These are just a few examples of the implausible aspects of defendant's testimony.

¶ 53    Aside from the implausibility of defendant's testimony, he was also a convicted felon who acknowledged lying to the police about the incident. Furthermore, the State introduced evidence that defendant solicited a fellow inmate to murder K.O. See *People v. Baptist*, 76 Ill. 2d 19, 27 (1979) (evidence that the defendant attempted to kill eyewitnesses was admissible to show consciousness of guilt). Defendant never denied this allegation.

¶ 54    The other evidence that defendant presented likewise did not meaningfully undermine K.O.'s testimony. Two of defendant's neighbors testified that they did not notice anything unusual on June 28, 2015. One of the neighbors testified that, although he did not see defendant walking from defendant's house to K.O.'s car, he did see defendant entering K.O.'s car. This neighbor testified that he did not see a gun in defendant's hand at that point. K.O.'s testimony that defendant kept the gun in his hand when they walked to her car and that he was "kind of *** waving it around" was not necessarily inconsistent with the neighbors' testimony, as neither neighbor claimed to see defendant before the moment that he entered K.O.'s car. Furthermore, the neighbor who testified that he did not see a gun in defendant's hand acknowledged that he was not paying "any particular attention" to defendant that day.

¶ 55    The gas station attendant's testimony that she did not notice anything unusual on the day in question likewise did not undermine K.O.'s credibility. K.O. did not claim that anything of note happened at the gas station that the attendant could have observed (the gas station attendant could not view the women's bathroom from where she was standing).

¶ 56    Defendant introduced evidence that K.O.'s aunt told a police officer that K.O. called *her* on the day of the incident, not the other way around. It seems that there may have been a

miscommunication between K.O.'s aunt and the police officer, as it makes no sense that K.O. would call her aunt on the phone just to say that she could not talk at the moment. At any rate, we note that the extraction report of K.O.'s phone confirms that the call at issue came from the aunt's phone to K.O.'s phone.

¶ 57 Finally, a police officer testified in defendant's case-in-chief that he had an opportunity to view the surveillance video from the second gas station that K.O. and defendant went to on June 28, 2015. According to the officer, the video depicted a man in a Cubs jersey standing alone at the counter. The officer's description of what he saw on the surveillance video was consistent with K.O.'s testimony. Specifically, K.O. testified that she placated defendant by assuring him that they would rekindle their relationship. Defendant then threw his gun into a lake, and they drove back to his home. K.O. explained that, on their way back to defendant's home, they stopped at the second gas station, where defendant got drinks for them. The police officer's description of what he saw on the surveillance video at the second gas station thus did not undermine K.O.'s credibility.

¶ 58 In summary, defendant failed to meet his initial burden to show that the State's witnesses provided false testimony at trial and that the prosecution knowingly failed to correct that false testimony. Even assuming that defendant met his initial burden, any error was harmless beyond a reasonable doubt because (1) this was a bench trial, so we do not have to speculate about how the allegedly false testimony might have affected the outcome of the trial, (2) the status of K.O.'s relationship with Kleveno at the time of the incident was of marginal relevance, if any, (3) there was already evidence at trial suggesting that K.O. was involved in a "love triangle" in June 2015, and (4) the evidence against defendant was overwhelming. Accordingly, the trial court's

conclusion that there was no due process violation was not against the manifest weight of the evidence.

¶ 59                                      2. *Ineffective Assistance of Counsel*

¶ 60    In a closely related argument, defendant maintains that his trial counsel provided ineffective assistance. According to defendant:

> "Had counsel introduced the relevant text messages from the extraction report, he could have shown directly that K.O. lied on the stand about the nature of her relationship with Kleveno in June of 2015. *** He could have further shown that K.O.'s close romantic relationship with Kleveno gave her motive to lie about the nature of her encounter with the defendant on June 28."

Defendant's argument regarding the prejudice that he suffered echoes the argument that he made in support of his due process claim. The State responds that defendant failed to meet his burden under either prong of *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 61    To demonstrate a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. If the defendant fails to demonstrate prejudice, there is no need to inquire as to the sufficiency of counsel's performance. *Strickland*, 466 U.S. at 697. Prejudice in this context means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶ 62    For the same reasons that we rejected defendant's due process argument, we must reject his ineffective assistance claim for his failure to establish prejudice. We need not consider the sufficiency of defense counsel's performance.

¶ 63                                      B. Armed Violence

¶ 64     Defendant also challenges the sufficiency of the evidence supporting his armed-violence conviction.  Count VII of the indictment charged defendant as follows:

"That on or about June 28, 2015, *** DANIEL E PERKINS committed the offense of ARMED VIOLENCE ***, in that said defendant, while armed with a Category I weapon, a handgun, knowingly performed acts prohibited by 625 ILCS 5/4-103(a)(1), Unlawful Possession of Converted Motor Vehicle, in that the defendant, a person not entitled to possession of said vehicle, possessed a Nissan Pathfinder, *** knowing it to have been converted."

¶ 65     According to defendant, his armed-violence conviction must be reversed outright because the trial evidence did not show that he "significantly interfered with K.O.'s possessory right over her motor vehicle."  Defendant proposes that the prosecutor's theory at trial—that defendant commandeered K.O.'s car by forcing her to use it for his benefit—is incompatible with the law of conversion, as "[a] person cannot simultaneously be in possession of her property and be deprived of her right to possess the same property."  Even assuming the validity of the State's theory, defendant insists that he did not convert K.O.'s vehicle, given that (1) he spent less than two hours in K.O.'s car, (2) K.O. remained in control of her car throughout the incident, and (3) K.O. "possessed [the car] without any interference after the incident was over."  In presenting his argument, defendant relies heavily on this court's decision in *People v. Sergey*, 137 Ill. App. 3d 971 (1985).  Defendant candidly acknowledges that *Sergey* "involved unique facts" and has subsequently been distinguished by other cases "based on the absence of those unique facts."

¶ 66     The State responds that, because defendant forced K.O. to drive her car at gunpoint while defendant dictated their route, K.O.'s "right to possession and control was interfered with as much as if she had been left at the side of the road while the defendant drove off."  The State maintains

that the fact that defendant temporarily deprived K.O. of her car was sufficient to sustain his conviction of armed violence. The State also cites *People v. Reese*, 2017 IL 120011, which involved a charge of aggravated vehicular hijacking, and asks us to apply its holding here.

¶ 67 The relevant inquiry when assessing the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. McLaurin*, 2020 IL 124563, ¶ 22. Although defendant requests review under the *Jackson* standard, the State responds that *de novo* review might be warranted because defendant raises a question of statutory interpretation. We believe that the *Jackson* standard of review is appropriate here, as the parties do not dispute the meaning of any statute and defendant does not ask us to adopt any broadly applicable legal rules. Defendant merely contends that the facts presented did not prove that he converted K.O.'s car. We note, however, that our analysis would be the same under any standard of review.

¶ 68 Section 32A-2(a) of the Criminal Code of 2012 provides that "[a] person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law," except for certain specifically excluded offenses that are not relevant to this case. 720 ILCS 5/33A-2(a) (West 2014). Section 4-103 of the Illinois Vehicle Code provides that it is a Class 2 felony for "[a] person not entitled to the possession of a vehicle or essential part of a vehicle to receive, possess, conceal, sell, dispose, or transfer it, knowing it to have been stolen or converted." 625 ILCS 5/4-103(a)(1), (b) (West 2014). The phrase "stolen or converted" is in the disjunctive, so courts have interpreted this language as giving rise to distinct legal theories. See *People v. Brand*, 2020 IL App (1st) 171728, ¶ 40 ("[A] conviction under section 4-103(a) may be predicated

on defendant possessing a vehicle, knowing that it was stolen, or on defendant possessing a vehicle, knowing that it was converted.").

¶ 69    There is no dispute that defendant was armed with a firearm on June 28, 2015.  Thus, to sustain defendant's conviction of armed violence predicated on the possession of a converted motor vehicle, the State had to prove that (1) defendant possessed K.O.'s car, (2) he was not entitled to possess the car, and (3) he knew that the car was converted.  *Brand*, 2020 IL App (1st) 171728, ¶ 40; Illinois Pattern Jury Instructions, Criminal, No. 23.35 (approved December 8, 2011). Property is deemed "converted" if a person who is lawfully entitled to possession of it has been wrongfully deprived of it.  Illinois Pattern Jury Instructions, Criminal, No. 23.35a (approved December 8, 2011) (hereinafter IPI Criminal No. 23.35a).

¶ 70    As defendant effectively concedes in his reply brief, the evidence, when construed in the light most favorable to the State, plainly satisfied the elements of the *uncharged offense* of aggravated vehicular hijacking.  "A person commits vehicular hijacking when he or she knowingly takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force."  720 ILCS 5/18-3(a) (West 2018).  The offense is elevated to aggravated vehicular hijacking when the defendant "carries on or about his or her person or is otherwise armed with a firearm."  720 ILCS 5/18-4(a)(4) (West 2018).  In *Reese*, which was decided after defendant's trial, our supreme court held that the act of threatening the driver of a vehicle and ordering him or her to drive the vehicle satisfies the "taking" element of the aggravated vehicular hijacking statute.  *Reese*, 2017 IL 120011, ¶ 43.

¶ 71    Presumably, the State did not charge defendant with aggravated vehicular hijacking, because such a charge was unavailable under the existing law when defendant was charged and tried.  Thus, the State charged defendant with armed violence predicated on possessing a converted

motor vehicle. The parties have not cited, and we did not find, any case where the State theorized that a defendant converted a car by forcing the owner of the car to drive it at gunpoint. For the following reasons, we hold that the evidence was sufficient to support defendant's armed-violence conviction.

¶ 72 The first element that the State had to prove was that defendant "possessed" K.O.'s car on June 28, 2015. We find instructive *People v. Anderson*, 188 Ill. 2d 384 (1999). The evidence in that case showed that Mr. Anderson was shoplifting when he met another individual who had recently stolen a car. The two men then used the stolen car to drive to other locations to shoplift more goods and sell them. The men ultimately got in a high-speed chase with the police, and Mr. Anderson was arrested as he fled from the passenger's side of the stolen car. *Anderson*, 188 Ill. 2d at 387-88. The trial judge found Mr. Anderson guilty of possession of a stolen vehicle, even though he did not personally steal the car and he never drove it. *Anderson*, 188 Ill. 2d at 388. Our supreme court upheld the conviction, reasoning:

> "[W]e believe that there was sufficient evidence presented for the trier of fact, the trial judge in this case, to find defendant in possession of the stolen vehicle. Defendant was not merely a passive occupant who did not know that the Trans Am was stolen. Rather, defendant was actively engaged in using the stolen vehicle in furtherance of a criminal venture for his personal benefit. Thus, based on all the evidence, defendant's joint use of the vehicle with the driver constituted possession of the vehicle within the meaning of the statute." *Anderson*, 188 Ill. 2d at 393.

¶ 73 Like *Anderson*, the evidence here supports a conclusion that defendant possessed K.O.'s car on June 28, 2015, even though he did not personally drive the car. In the light most favorable to the State, the evidence showed that defendant actively engaged in using K.O.'s car in furtherance

of a criminal venture for his personal benefit.  The evidence thus satisfied the first element of the State's conversion theory.

¶ 74    Defendant does not challenge the second element of the State's theory—*i.e.*, that he was not entitled to possess K.O.'s car.  In the light most favorable to the State, the evidence certainly supported a conclusion that defendant had no right to possess K.O.'s car.

¶ 75    The final element is that defendant knew that the car he possessed was "converted."  Although *Sergey* involved unique facts that are distinguishable, because (1) defendant relies heavily on *Sergey* and (2) *Sergey* sheds light on what it means for a defendant to knowingly possess a converted car, we will examine it in detail.

¶ 76    After a night of drinking, Mr. Sergey went to his employer's property, which was used to store cars and equipment.  There were 30 to 50 cars on the property, most of which were owned by Mr. Sergey's employer.  Apparently, unbeknownst to Mr. Sergey, some of the cars were owned by a different person, Richard Schoenneman.  Mr. Sergey noticed a 1977 Oldsmobile Cutlass with the keys in the ignition.  Assuming that the Cutlass belonged to his employer and that his employer would not mind if he borrowed it, Mr. Sergey drove it to a tavern to get more beer (the State did not rebut Mr. Sergey's claim that his employer would have allowed him to borrow a car that night).  Approximately 20 minutes later, Mr. Sergey left the tavern and drove back to his employer's property.  As he was doing so, he was pulled over by the police and arrested for drunk driving.  As it turned out, the Cutlass belonged to Schoenneman.  The State charged Mr. Sergey with driving under the influence of alcohol (DUI), possession of a converted motor vehicle, and theft.  The trial court found Mr. Sergey not guilty of theft but guilty of both DUI and possession of a converted motor vehicle.  *Sergey*, 137 Ill. App. 3d at 972-74.

¶ 77 On appeal, Mr. Sergey argued that (1) "his use of the car, although without express authorization, insufficiently interfered with the owner's rights to constitute conversion" and (2) "given the nature of his use and his reasonable belief that he was merely borrowing his employer's car, he could not have known his conduct constituted conversion." *Sergey*, 137 Ill. App. 3d at 974. We agreed and reversed defendant's conviction of possession of a converted motor vehicle.

¶ 78 Given that the term "converted" was not defined in the Illinois Vehicle Code and no court had yet interpreted the term,[1] we deemed it "appropriate to consult the common law." *Sergey*, 137 Ill. App. 3d at 974. We explained:

"Illinois case law generally defines civil conversion of a chattel as an unauthorized and wrongful assumption of the right to possession or ownership in the property which deprives the owner of his rights as owner. [Citations.] The measure of damages for conversion is the full value of the chattel, so the tort of conversion is usually confined to those major interferences with a chattel or the owner's rights therein which are so egregious as to merit what is, in essence, a forced judicial sale of the property. [Citations.] Both the Restatement [(Second) of Torts] and Prosser and Keeton's text agree that a brief unauthorized use of a car left undamaged by the defendant, such as his driving it only 10 miles, as opposed to a trip of hundreds of miles, should not be held to be a conversion." *Sergey*, 137 Ill. App. 3d at 975.

_____

[1] At the time of our decision in *Sergey*, there was no pattern jury instruction defining "converted."

We also noted that, in a case decided in 1843, our supreme court determined that a defendant was not liable to a plaintiff for civil conversion where the defendant, who was contracted to feed and board a horse, rode that horse for 15 miles without any resulting harm to the horse. *Sergey*, 137 Ill. App. 3d at 975 (citing *Johnson v. Weedman*, 5 Ill. 495, 496-97 (1843)).

¶ 79 Applying the civil common law understanding of conversion to the facts at hand, we concluded that Mr. Sergey did not violate section 4-103 of the Illinois Vehicle Code. We explained:

"In the instant case there was no proof of damage to the car and the owner did recover it. Also, defendant had no intent to permanently deprive the owner, and it is unrefuted that the defendant's employer, whom defendant believed was the owner, would have given him permission to use the vehicle had he owned it. And, as was true of the defendant in *Johnson v. Weedman*, defendant here only temporarily used the property without causing any harm to it. Based on these facts and the foregoing analysis of the nature of the tort of conversion, we cannot say that the legislature intended to punish conduct such as the defendant engaged in. Otherwise, every act of borrowing a friend's chattel without his express permission at that time would constitute a criminal conversion. Accordingly, we hold the defendant did not violate section 4-103 of the Illinois Vehicle Code and reverse his conviction thereon." *Sergey*, 137 Ill. App. 3d at 975-96.

¶ 80 We have repeatedly distinguished *Sergey* based on its unique facts. See *People v. Gengler*, 251 Ill. App. 3d 213, 222 (1993); *People v. Pozdoll*, 230 Ill. App. 3d 887, 889-90 (1992); *People v. Washington*, 184 Ill. App. 3d 703, 709 (1989). We have clarified that "intent to permanently deprive is not an element of the offense of possessing a stolen or converted motor vehicle." *Gengler*, 251 Ill. App. 3d at 221. We have also held that a defendant may convert a car for purposes

of section 4-103(a)(1) of the Illinois Vehicle Code, even if he uses it for a period as brief as 15 minutes without damaging it. See *Pozdoll*, 230 Ill. App. 3d at 890 ("[W]e cannot agree with defendant's position that conversion cannot be found where there is only temporary use of property without causing harm to it. To do so would ignore the element of implied consent present in the *Sergey* case which reduced the borrower's culpability."). It is also clear from the post-*Sergey* case law that, although the meaning of "converted" for purposes of section 4-103(a)(1) of the Illinois Vehicle Code may be informed by the common law tort understanding of that term, criminal and civil liability for conversion are not coextensive. See *Gengler*, 251 Ill. App. 3d at 222 (identifying a hypothetical situation in which a person might be civilly but not criminally liable for conversion).

¶ 81    We hold that the evidence supported a conclusion that defendant knew that K.O.'s car was converted. "Property has been 'converted' if a person lawfully entitled to possession of that property has been wrongfully deprived of it." IPI Criminal No. 23.35a. At trial, the State argued that defendant wrongly deprived K.O. of the use of her property by commandeering her car at gunpoint. The evidence, when construed in the light most favorable to the State, supported that theory. Defendant deprived K.O. of the free use of her car for approximately two hours. Defendant agreed to allow K.O. to return to defendant's home, where they both knew that the police would be waiting, only after she promised to rekindle her relationship with him. By any measure, defendant's conduct effectuated a major interference with K.O.'s use of her car. Forcing K.O. to use her car against her will was at least as significant an interference with K.O.'s right to possess the car as if defendant had simply taken her keys and driven away. Although we spoke in *Sergey* about interferences that are "so egregious as to merit what is, in essence, a forced judicial sale of the property" (*Sergey*, 137 Ill. App. 3d at 975), as noted above, after our decision in *Sergey*, we affirmed a conviction for possession of a converted motor vehicle where (1) there was no damage

to the car and (2) the defendant was apprehended within 15 minutes of the car's disappearance. See *Pozdoll*, 230 Ill. App. 3d at 890; see also *Gengler*, 251 Ill. App. 3d at 221 (intent to permanently deprive is not an element of the offense of possessing a converted motor vehicle). Under the circumstances, the trial court here was justified in finding that the "converted" element of the State's theory was satisfied.

¶ 82    For these reasons, we hold that there was sufficient evidence to sustain defendant's conviction of armed violence predicated on his possession of a converted motor vehicle.

¶ 83                                III. CONCLUSION

¶ 84    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 85    Affirmed.

---

**No. 2-17-0963**

---

| | |
|---|---|
| **Cite as:** | *People v. Perkins*, 2020 IL App (2d) 170963 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 15-CF-187; the Hon. Robert P. Pilmer, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys For Appellant:** | James E. Chadd, Thomas A. Lilien, and Fletcher P. Hamill, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eric Weis, State's Attorney, of Yorkville (Patrick Delfino, David J. Robinson, and David E. Mannchen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---