2022 IL App (1st) 181670

FIRST DISTRICT
SIXTH DIVISION
January 28, 2022

No. 1-18-1670

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 91 CR 21147 |
| TERRANCE BROOKS, | ) ) ) | Honorable Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Terrance Brooks was convicted of multiple counts of first degree murder and sentenced to death. The judgment was affirmed on direct appeal. *People v. Brooks*, 187 Ill. 2d 91 (1999). His sentence has since been commuted to life imprisonment. He now appeals from a circuit court order granting the State's motion to dismiss his successive postconviction petition, contending that he made a substantial showing that the State knowingly used perjured testimony to obtain his conviction. For the reasons stated below, we affirm.

¶ 2                                        I. JURISDICTION

¶ 3    In 2014, the circuit court granted defendant leave to file a successive postconviction petition. The court dismissed the resulting petition on June 11, 2018, and defendant filed his notice of appeal on July 11, 2018. Accordingly, this court has jurisdiction pursuant to article VI, section

6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651(a) (eff. July 1, 2017) governing appeals from a final judgment in a postconviction proceeding.

¶ 4                                II. BACKGROUND

¶ 5     Defendant and codefendants Javan Deloney (Javan), Maurice Deloney (Maurice), and Curtis Milsap were charged in relevant part with the first degree murders by shooting of Rhenardo Bussle, John Coleman, and Gregory Archibald and the attempted first degree murders by shooting of Allen Epton,[1] George Cruthard, and Marcus Taylor, all allegedly committed on or about August 7, 1991. Ivan Smith (Ivan) was charged with the same offenses in a separate indictment.

¶ 6                             A. Motions to Suppress

¶ 7     Defendant filed pretrial motions to suppress identification testimony by Epton, Cruthard, and Brenda Hall, alleging that police used unduly suggestive identification procedures and seeking to suppress in-court identifications and testimony about photographic and lineup identifications.

¶ 8                                   1. Epton

¶ 9     Police detective Daniel McWeeny testified that, on August 7, 1991, he was investigating two shootings on the same night, one in which Coleman and Archibald were killed and Epton was wounded, and the other where Bussle was killed and Taylor was wounded. A taxi was seen and 9-millimeter shell casings were found at both scenes, and a red Chrysler LeBaron was also involved. McWeeny went to a hospital to speak to Epton on August 8, and Epton confirmed that he was with Coleman and Archibald when shots were fired from a red LeBaron and a taxi.

---

[1]Epton testified that his last name is Eppting and he is also known as Alan Lacking. However, since he was repeatedly referred to as Epton in the record and the supreme court opinion, we shall continue doing so for clarity.

¶ 10   McWeeny returned to the hospital later that day and told Epton that he had spoken to Taylor, a Gangster Disciple, and learned about ongoing violence between the Gangster Disciples and Black Disciples. He also told Epton that Archibald and Coleman were dead, which prompted Epton to give his account. Epton acknowledged being a member of the Gangster Disciples. He was with Archibald and Coleman when a taxi and a red LeBaron drove by. Shots were fired from both cars, and Epton, Archibald, and Coleman were shot. The taxi was driven by "Tojo," a Black Disciple, and Epton recognized other occupants of the cars as Black Disciples. He believed that the LeBaron was sometimes driven by "Dada" but did not see Dada in either car. However, he saw two of Dada's relatives named Deloney. The only other person Epton said he saw was Ollie Bays.

¶ 11   McWeeny later returned to the hospital with eight photographs, from which Epton identified Maurice and Javan as participants in the shooting. McWeeny then spoke with Javan, who confirmed that he, Maurice, Tojo, and Bays were involved and added that defendant and Milsap were also involved. McWeeny then brought Epton two photographic arrays. Epton identified defendant from one array and Milsap and Bays from the other array as being involved in the shooting. When McWeeny learned that Tojo was Ivan, he added Ivan's photograph to the latter array and asked Epton if he could identify anyone else. Epton identified Ivan as Tojo. Defendant was arrested shortly after Epton's identification, and Epton identified defendant in a lineup in which defendant was the only person whose photograph Epton had previously viewed.

¶ 12   Epton testified that he was shot alongside Coleman and Archibald at about 11 p.m. on August 7, 1991. Police came to see him in the hospital, and he spoke to them several times before he was shown any photographs. He acknowledged that defendant's photograph was among those he viewed in the hospital but denied that he had mentioned defendant to the police and indeed

denied naming any perpetrators before he looked at the photographs. Before the shooting, he knew defendant only as "Terry." Police had emphasized defendant's picture and nobody else's, stopping at his picture as they leafed through the photographs while saying, "This is the person. Isn't this him?" Epton told police that he knew defendant but did not say defendant "did it."

¶ 13    The State argued that there was no identification to suppress because Epton denied making one. Defendant noted the police testimony that Epton made an identification and argued that the court should rule on whether suggestive techniques rendered it inadmissible. The court declined to rule because "if he didn't identify, it's a question of fact" for the trier of fact.

¶ 14                                    2. Cruthard and Hall

¶ 15    Cruthard testified that he, Bussle, and Taylor were shot at about 10:50 p.m. on August 7, 1991. In June 1993, Cruthard was taken to view photographs with Assistant State's Attorney (ASA) Michael Smith (Smith) and two detectives. He had been brought to the state's attorney's office several times in the previous three or four months and spoke to Smith several times prior to viewing the photographs. Smith had told him, "We already know who shot you," "Little Terrence shot you," and Tojo was involved in the incident. He also mentioned other names that Cruthard could not recall. Cruthard knew that Tojo was Ivan and Little Terrence was defendant. Cruthard identified the array of six photographs he was asked to view in June 1993. From it, he had identified defendant and Ivan, both of whom he knew for "a number of years."

¶ 16    Detective Joseph Stehlik testified that he interviewed Cruthard in June 1993 after reading in the news that he was in jail following his arrest for a drug offense. Cruthard told Stehlik that he witnessed the events of August 7, 1991, and that defendant and Ivan were involved. Cruthard said

he knew both for many years. Stehlik showed Cruthard an array of six photographs, and he identified photographs of defendant and Ivan as depicting them.

¶ 17    Hall testified that, in April 1993, she went to the state's attorney's office with Detective Michael Kill. Smith asked her to view some photographs on a table, and she selected photographs of defendant and Javan. Before then, she had not been shown any photographs relating to this case, though she had been to the state's attorney's office three or four times, including to report finding a bullet in her car. Smith had questioned her twice about the shootings, but she did not tell him anything. Indeed, she said nothing about any of the perpetrators before viewing the photographs. Nobody with the state's attorney's office said anything to her before showing her the photographs. When Hall had been asked if she had ever seen any of "these boys" before, she "told them no, because they almost killed me and my baby."

¶ 18    The court denied the motions regarding Cruthard and Hall. Defendant argued that there was unrebutted testimony that Smith told Cruthard that defendant and Ivan were involved in the shooting before showing him the photographs. The court found that said testimony would go to weight rather than admissibility and reiterated that the motion was denied.

¶ 19                                    B. Trial

¶ 20    The trials of defendant and Maurice were severed from those of Javan, Milsap, and Ivan. The 1994 bench trial of defendant and Maurice was simultaneous with the bench trials of Javan and Milsap and Ivan's jury trial. Thus, we shall summarize the trial evidence in defendant's case.

¶ 21                        1. State's Evidence – Bussle Killing

¶ 22    Officer Patrick Doyle testified that he was on patrol on August 7, 1991, and shortly before 11 p.m. received a call of shots fired and a person shot at a certain apartment building. On arriving

there, he saw a victim with a bleeding chest wound lying in the walkway leading to the building's front door. Doyle later learned that the victim was Bussle. Doyle also noticed bullet holes around the front door. The streetlights in front of the building were lit. After speaking to witnesses, Doyle put out a description of a red and white taxi wanted in connection with the shooting. He also learned that two other shooting victims had fled to a location about a block away and there found Cruthard and Taylor. They would not provide information about the shooting but were both visibly wounded, Cruthard on the left side of his neck and Taylor on the right side of his abdomen.

¶ 23    Bussle's autopsy showed that he had a gunshot wound entering his back and exiting his chest, damaging internal organs and causing extensive bleeding.

¶ 24    Cruthard testified that he was serving a 15-year prison sentence for a drug offense and acknowledged being a member of the Gangster Disciples, who sold drugs from the aforesaid apartment building. On the late afternoon of August 7, 1991, he was standing on the corner near that building with several of his "homies." A shot was fired at a car belonging to "Tojo" or Ivan, a member of the rival Black Disciples, from the side of the street where Cruthard was standing. Cruthard did not know if Ivan was hit by the shot. After the shot was fired, Cruthard fled.

¶ 25    At about 10 or 11 p.m., Cruthard was standing in front of the apartment building with Bussle and Taylor. He saw three cars coming slowly towards them, one being a taxi with its headlights off. As they came closer, the windows on the passenger sides of the cars came down, and Cruthard noticed that Ivan was driving the taxi. He also saw defendant in the taxi between the front and back seats and leaning forward towards the door. He had known defendant for a few years and knew him to be a member of the Black Disciples. There was then a "[l]ot of shooting" and flashes of lights came from the front and back seat of the taxi. Defendant appeared to be

shooting, but Cruthard could not see anyone else's face in the taxi. Taylor was standing up as if in a daze, so Cruthard knocked him down and lay on top of him. The shooting continued, and Cruthard felt a burning sensation in his back. He leapt up and ran towards the side of the building and then toward his home. As he ran, he saw Bussle lying in the doorway. The gunfire continued as he fled, and he was shot in the jaw and the back of the head. He reached home, and Taylor, visibly bleeding, also made it there.

¶ 26    Cruthard remembered speaking to police at the hospital but not which officers. He did not tell police who was involved in the incident because he did not want to be arrested and was worried about himself and his family being caught up in the gang "war." He then went into hiding from the police, eventually being arrested on a drug offense. In June 1993, well after his arrest, he gave a written statement to the state's attorney's office. Shortly thereafter he was sentenced to 15 years in prison for the drug offense. The only agreement in exchange for his statement was that the state's attorney would recommend that he not be sent to certain prisons.

¶ 27    On cross-examination, Cruthard acknowledged originally telling police that he did not see the shooting because he dropped something and was bent over picking it up at the time. He also acknowledged that the shooting was going on for only a second or so when he covered Taylor. Defendant was not leaning out of the taxi at the time of the shooting but was inside with the interior lights off, though the streetlights on the corner were lit. "[E]verybody on the street" knew within a week or two of the shooting that defendant had been arrested.

¶ 28    Though Cruthard was hiding from police by keeping a "low profile," he gave his actual name and birthdate when arrested in July 1992. When he was arrested again in December 1992, he had about 10 pounds of cocaine. He lost a motion to suppress in May 1993. He had been to the

state's attorney's office twice before his June 1993 statement to Smith. Smith had told Cruthard that he knew who shot him but did not say that it was defendant or Ivan. Cruthard acknowledged his previous testimony that Smith had told him that defendant and Ivan shot him before he viewed the photographs. He now denied that Smith did so but maintained that he was not lying before when he said that Smith made those assertions. The first time Cruthard told anyone about seeing defendant in the taxi was his June 1993 statement, which he gave on the same day he was sentenced on his drug case.

¶ 29     Taylor testified that, on the afternoon of August 7, 1991, he was standing at the aforesaid corner with Cruthard and Kevin Gibbs. A building at the corner was used by the Gangster Disciples, including Taylor, as a "hangout" and to sell drugs. Ivan drove by in a gray Chevrolet Chevette; Taylor had known him for a few years. Ivan flashed a gang sign, and Gibbs flashed one back and said "BDK" or Black Disciple killers, to which Ivan replied "GDK" or Gangster Disciple killers. Said gangs were "at war" then. Someone on the third floor of the building fired a shot at Ivan's car, and Ivan said he would be back. Taylor explained that the Gangster Disciples kept armed "security" on the third floor of the building to cover their men on the street.

¶ 30     At about 11 p.m. that day, Taylor was selling drugs in front of the same building with his cousin Bussle and Cruthard. Taylor saw two cars drive up, a red LeBaron and then a taxi. The LeBaron stopped in the middle of the intersection, and the taxi stopped in front of the building. The windows on the taxi's passenger side rolled down, and the nose of a gun came out. However, when the shooting began, he could not see who was firing. Cruthard pushed him down, and he lay on the sidewalk until the shooting subsided. The taxi was stopped for about 30 seconds during the shooting. After the shooting ended, Taylor got up to check on Bussle. He then saw defendant in

the front passenger seat of the taxi before it sped away. Taylor had known defendant for many years and identified him in court. Taylor could not identify anyone else in the taxi and particularly could not tell if the driver was Ivan. Cruthard got up and fled when the shooting subsided for a few seconds, and the shooting stopped altogether after Cruthard ran away.

¶ 31    Taylor went to check on Bussle, finding him in the doorway choking on blood before passing out, then went to find Cruthard. Cruthard was visibly wounded and went to the hospital by ambulance. Taylor had been grazed with a bullet and went to the hospital, but he did not go when Cruthard did because he "didn't want to be involved." Taylor spoke to police a day after the shooting but did not say that he saw who fired because the "war" was ongoing and he "didn't want to be next." He told police then that he was not going to make any identifications. He also told police that someone exited the taxi during the shooting but denied at trial that anybody exited, explaining that he mistook one of his friends on the street for someone who exited the taxi.

¶ 32    Taylor then hid from police for about two years. He gave a statement to an ASA in April 1993 because Bussle's mother pressured him and Detective Kill came to bring him in. He was shown many photographs but did not recognize anyone and none depicted defendant. Neither police nor the ASA told him that defendant was a shooter, though the ASA mentioned Ivan. Within a week or so of the shooting, the Gangster Disciples knew that defendant had been arrested.

¶ 33                    2. State's Evidence – Coleman and Archibald Killings

¶ 34    Officer Clarence Longley testified that he and another officer responded at about 11 p.m. on August 7, 1991, to a report that a person had been shot at a certain location. Arriving there, he saw three people had been shot including Coleman and Archibald. The streetlights were working

that night. After speaking to witnesses, Longley and his partner were seeking a red and cream taxi reportedly used in the shootings.

¶ 35    Archibald's autopsy showed a gunshot wound through his head from the back. Coleman's autopsy showed a gunshot wound to the chest, and a spent bullet was recovered.

¶ 36    Marcella Scott testified that on August 7, 1991, she was with Hall in separate cars when Hall visited Epton. Both Scott and Hall stayed in their cars as Hall spoke with Epton. A short time later, Scott heard a sound like firecrackers and felt a burning sensation in her back, She turned around and saw that her rear window had been shattered. She exited her car to go to Hall's car and did not see any guns or initially see anything unusual about the passing cars. She then noticed a taxi in the distance but did not see any of the faces in the taxi. Hall's car had also been shot. Hall told Scott to get back in her car and they drove away. Before leaving, Scott saw that two people had been shot, one on the ground and another who stood in a doorway before falling. Scott later met with police and gave them spent bullets from her car.

¶ 37    Hall testified that she no longer lived where she did in August 1991 because the state's attorney's office helped her move with $750 for rent and $150 for moving expenses. On August 7, 1991, she was with her infant son and her cousin Scott. Scott and Hall went in separate cars to visit Hall's friend Epton. He came to Hall's car and spoke with her for about 10 minutes before going to speak with Scott. As Hall waited, she heard what sounded like fireworks. She looked toward the street, where she saw a taxi with two men firing guns from inside it. At trial, she identified Javan and defendant as those men. The taxi kept moving, After putting her son in his car seat, she looked around and saw three people on the sidewalk. One was Epton, who had been shot in the foot, one was lying still, and the third was spitting up blood and asking for help. Scott

told Hall that they should drive around the corner. After they did, Hall noticed that their cars had been shot; she found a shell fragment in her car, and Scott's car had a bullet hole and its rear window was gone. At trial, Hall identified pictures of the taxi and confirmed that she identified defendant and Javan as the shooters from photographs in April 1993.

¶ 38    On cross-examination, Hall testified that, when she first heard the shots, they seemed to be coming from behind her. Scott asked if she heard it, and that was when Hall turned around and saw the taxi speeding away. She did not see any other cars, and she looked at the taxi for only about two seconds before covering her baby. While it was night, the street lights were lit. She did not know if the two men she saw in the taxi were wearing hoods or hats, and she had not seen either before that night. Defendant was in the front of the taxi leaning out the window as the other man leaned out the back window, and both were leaning so far that their chests were outside the taxi. It was dark inside the taxi, and defendant was wearing a dark shirt. Hall maintained that her car window was fully open at the time of the shooting but acknowledged that a bullet passed through her car door. She did not know if Coleman or Epton was a Gangster Disciple. She denied arguing with Epton while he was in the hospital about her or her son "almost [being] shot because of the Gangster Disciples."

¶ 39    Hall was not shown any photographs for identification purposes until April 1993, and she spoke with Kill but not Smith before then. Hall then admitted that she went to Smith's office in September 1991 when she brought in a bullet she found in her car. Smith asked her no questions then, and she denied speaking to him any other time before April 1993. She acknowledged giving a statement to the effect that she had been to his office three or four times and he had asked her

questions about the shooting twice before April 1993, but denied at trial that it was so. She was unsure how many times she had been to his office.

¶ 40  Before Hall viewed the photographs in April 1993, she had never heard defendant's name. Epton never mentioned it to her nor had any police or ASAs. She acknowledged that defendant's name was written on the back of the photograph she selected. She did not know who wrote it but it was there when she viewed the array. She had seen the array twice before trial but could not recall the other instance. While nobody told her the person in the photograph was defendant, all one would have to do is look at the back of the picture. Hall first testified that she had not done so but then admitted she had. While Kill drove Hall to court and to Smith's office each time she went there, he never asked her about this case.

¶ 41  Epton testified that he knew defendant and identified him at trial. On August 7, 1991, Epton was shot in the foot from a taxi; he saw the flash of gunfire but could not tell who or how many people were firing. He acknowledged a signed statement he gave to Javan's counsel but testified that he gave it because he was being threatened by people in his neighborhood. In the statement, Epton said that defendant was the only person he could positively identify, that he saw defendant in the back passenger-side window of the taxi, and that he had identified Javan under pressure.

¶ 42  On cross-examination, Epton testified that on the night of the shooting he was speaking to Hall at her passenger side window and then went to a nearby restaurant. He heard a car and shots being fired from the car, and he turned around to see Hall grabbing her baby and going to the floor of her car. He also saw the taxi moving quickly. By the time Epton looked up again, Hall was gone. Epton did not see defendant in the taxi as it was too dark to see anyone.

¶ 43    When police first came to visit Epton in the hospital, he told them he could not identify anyone in the taxi because he had taken cover. He mentioned seeing a red LeBaron though he was unsure one was involved because "someone" said a LeBaron followed the taxi. The next time police came, they told him that the shooters were Black Disciples. Epton then named Maurice, Ivan, and Bays because he knew them to be Black Disciples. He did not name defendant though he knew who defendant was. When police came back with photographs, they stopped at defendant's photograph and said "this is him, this is him right here." Epton told them that he recognized the man in the photograph.

¶ 44    At the time of trial, Epton was serving a six-year prison sentence for armed violence. While in jail, he was taken two or three times to the state's attorney's office and told Smith that he did not see who did the shooting. Epton declined to cooperate but received the minimum sentence.

¶ 45    The parties stipulated that Sheila Hanley, a witness to Epton's statement, would testify that Epton said in July 1992 that defendant was the only person he could positively identify.

¶ 46                    3. State's Evidence – Common

¶ 47    Detective James O'Brien testified that, after hearing a description of the taxi from the shootings, he saw such a taxi parked in a vacant lot. Its interior was strewn with shell casings, and as he recalled, they were all in the back seat. There were no keys in the ignition, and the steering column had been peeled open. The next day, he received a description of a red LeBaron involved in the incident and learned that a gray Chevrolet Chevette was also involved. He found the Chevette with bullet holes in it and Ivan's name on the "license applied for" form in the rear window. He could not locate the Chevette again, despite periodic efforts to do so, until March 1993. At that time, it had duct tape over the bullet holes and was titled to Ivan.

¶ 48    Evidence technician Patrick Moran testified to processing the Bussle crime scene. In addition to evidence of discharged firearms at the scene, he found a box of live ammunition on a windowsill on the third floor of the apartment building. Moran also processed the taxi in the vacant lot and found 55 shell casings, all in the rear passenger area. He found seven more shell casings in the taxi when he processed it at a police garage and, again, none were in the front of the taxi.

¶ 49                              4. Defense Evidence

¶ 50    Detective Tony Maslanka interviewed Taylor in 1991, who said that he would not make any identification but would supply information. Maslanka believed Taylor was apprehensive and fearful of making an identification. Taylor said that the rear passenger of the taxi rolled down his window and the other back seat passenger got out, then both began shooting. He provided only basic descriptions of those men, and he did not mention anyone in the taxi's front passenger seat.

¶ 51    Maslanka also interviewed Cruthard in 1991, who told him that someone may have been firing from across the street in addition to the shots fired from the taxi.

¶ 52    ASA William Marback interviewed Cruthard in June 1993, who said that the taxi's occupants began firing when it was three houses away. Cruthard acknowledged that the state's attorney's office agreed to recommend that he not serve his sentence in certain prisons.

¶ 53                              5. Judgment and Posttrial Motion

¶ 54    Following closing arguments, the court found defendant guilty as charged.

¶ 55    Defendant moved for a new trial on the basis that Taylor had recanted his trial testimony, and an evidentiary hearing was held on the motion.

¶ 56    Taylor testified that he did not tell the truth when he testified at trial that he saw defendant in the taxi nor when he testified that he had not been shown photographs of defendant before trial.

He had not seen anyone when the shots were fired because he was lying face down. Kill brought him to a meeting with Smith in April 1994 where he was shown two photographs of defendant after he said he could not identify anyone. Smith said that Taylor was "just going to let the *** bastard go that killed my cousin," Bussle. Smith then showed Taylor three photographs including two of defendant and one of his brother. When Smith said that defendant was "the guy that killed your cousin," Taylor replied that he knew defendant and refused to identify defendant as one of the shooters, saying "I don't want to have nothing to do with it." Smith said that Taylor could be held in contempt for six months. He also showed Taylor a gun that he said had been used in the shooting. Taylor then gave a statement with Kill and Smith present.

¶ 57    Kill brought Taylor to the state's attorney's office for trial. When Taylor said that he was not going to testify, Smith asked if "they" had gotten to him. Taylor denied it and explained that he would not testify because he had not seen anything. Smith said, "What, you just going to let the bastard go that killed your cousin?" The ASA also told him that what he said would come out one way or another, noting Taylor's written statement, and that he would be held in contempt of court and jailed for six months if he did not testify. Taylor repeated that he would not testify. Kill told him that he would protect him and defendant would never see the street again. Taylor was then shown three pictures of defendant, including two he had already seen. The only reason he testified that he saw something when he had not was fear. He did not recant due to any threats or promises.

¶ 58    On cross-examination, Taylor admitted that there was currently a truce between the Gangster Disciples and Black Disciples. When asked if it was true that gang members changed testimony pursuant to a truce, Taylor denied knowing anything about it and denied that he changed his testimony due to a truce. Rhonda Bussle (Rhonda), Bussle's mother, was pressuring Taylor to

testify against defendant before Kill came to him. Taylor denied telling her after trial that he was being forced to change his story. She told him that the state's attorney's office wanted her to find out why Taylor was changing his story. He told her that he was sorry his cousin was dead but he had not seen anything.

¶ 59    Taylor admitted he was hiding from the police as defendant's case was pending. He denied telling Kill to pick him up for trial in something other than a marked police car because he did not want the Black Disciples to know he was testifying. He also denied telling Kill that he had been approached by a Black Disciple who said, "If you testify, you're dead." When shown his statement, he acknowledged that it said that he was not threatened or promised anything and that he was afraid of defendant and his brother. He chose to contact defendant's counsel, and nobody brought him to meet with counsel. He understood that the penalty for perjury was one to three years in prison but opined that it was better than getting someone the death penalty by lying.

¶ 60    Taylor had denied coming to court with a man who sat in the back row and wore a gold star and an emblem around his neck. However, the State asked that the record reflect that Taylor left the courtroom with that man.

¶ 61    Rhonda testified that she told Taylor prior to April 1994 that he needed to talk to the state's attorney because he had told her that he knew defendant committed the crime. After trial, Taylor told her that he was forced to change his story and that he was scared, of whom he did not specify. He had given a statement to defendant's counsel. She was angry and told him that he would not be her "kin" anymore if he changed his account. When she saw him in the courtroom a couple of days later, he told her "[t]hey" brought him to court and "[m]ade me come." When she spoke to him again a few months later, he said that someone offered him money and forced him to go to court.

¶ 62    Kill testified that when Taylor first gave a statement in April 1994, he expressed fear that the Black Disciples would kill his girlfriend and son. Kill assured him he would be provided protection and his family would be moved if necessary. Kill picked up Taylor on the day of his trial testimony and drove him to the courthouse. Taylor had told him not to come in a police car as he feared being ambushed, so Kill used his own Jeep. On the way to court, Taylor told Kill that the Black Disciples told him the night before that they were not going to let him go to court. He told Kill that they were watching him when he left, and Kill was upset because Taylor had not mentioned that they had faced a potential ambush.

¶ 63    On cross-examination, Kill testified that, as far as he saw, Taylor was shown photographs of the taxi only. Kill did not investigate who had threatened Taylor nor mention the threats in his notes or reports, attributing the latter to Taylor saying "he didn't want it to go any further." He did not radio other officers for assistance when Taylor told him about the potential ambush because he did not have a radio in his Jeep and he was focusing on getting Taylor directly to court.

¶ 64    Following arguments, the court denied the motion for a new trial, stating that it would have found defendant guilty even if evidence of Taylor's recantation had come out at trial.

¶ 65                                6. Sentencing

¶ 66    The court sentenced defendant to death in 1994. However, defendant successfully moved for a new sentencing hearing because his jury waiver had been only for trial. In 1996, a jury found him eligible for the death penalty and, after an extensive sentencing hearing, found no mitigating factors sufficient to preclude imposing the death penalty. The court denied defendant's postsentencing motion and sentenced him to death.

¶ 67    During the 1996 sentencing hearing, Cruthard and Hall testified consistently with their trial testimony, including identifying defendant as a shooter and Cruthard acknowledging on cross-examination that he initially told police that he did not see the shooting.

¶ 68                                        C. Direct Appeal

¶ 69    On direct appeal, our supreme court found that the trial court erred in stating that suggestive identification procedures go to weight and not admissibility. *Brooks*, 187 Ill. 2d at 126. It also found that defendant made a *prima facie* case of suggestive identification procedures regarding Cruthard. *Id.* at 128-29.

> "Cruthard testified at the hearing on the motion to suppress that Smith told him several times, before showing him any pictures, that defendant was the one who shot him. Accordingly, the burden then shifted to the State to show an independent basis for Cruthard's identification. The State did not call Smith to rebut Cruthard's testimony. Absent a showing of an independent basis, the court should have granted the motion to suppress Cruthard's identification." *Id.* at 129.

However, the supreme court found such an independent basis.

> "Cruthard testified that, although the lights in the cab were off, the street lights on the corner were lit. The cars were moving slowly, and the cab was only five or six yards away when the shooting started. Although the shooting was going on for only 'a second or so' before Cruthard dove on top of Taylor, Cruthard could see that Ivan Smith was driving the cab and defendant was in the backseat, leaning forward toward the door. Thus, the evidence showed that Cruthard had an adequate opportunity to view the assailant." *Id.* at 130.

Moreover, "Cruthard was acquainted with defendant before the crime," knowing him for about four years. *Id.* Though Cruthard testified to not having much of an opportunity to see the shooter, and to being pressured to make an identification, the supreme court found a sufficient independent basis for his identification of defendant. *Id.* at 131-32.

¶ 70 The supreme court also found the trial evidence sufficient to convict defendant. While Epton and Taylor recanted their identifications, Taylor's recantation was made under suspicious circumstances and a reasonable trier of fact could believe Epton's statement to Javan's counsel in which he said he could identify only defendant over his trial testimony that he did not see who fired. *Id.* at 132-33. Defendant waived his suggestive identification claims regarding Hall and Epton, and the supreme court found an independent basis for Cruthard's identification of defendant so that it was sufficiently reliable. *Id.* at 134. While there were discrepancies in the eyewitness accounts, they agreed generally as to how the incident unfolded and particularly that defendant was on the passenger side of the taxi and the gunshots were fired from that side. *Id.* at 133-34. "Four eyewitnesses testified to seeing defendant in the taxicab, and two of them saw him shooting. Any issues involving their credibility were for the trial judge to resolve." *Id.* at 134.

¶ 71 D. Previous Postconviction Proceedings

¶ 72 Defendant filed a postconviction petition in 1997 and amended it in 1998 and 1999. He claimed actual innocence based on newly discovered evidence that Hall recanted her trial testimony in an attached affidavit. He alleged that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that several police witnesses were being investigated for using abusive tactics. He claimed trial counsel's ineffectiveness for failing to present an alibi corroborated by the affidavit of Curtis Branch. He also claimed that the State used the inculpatory

accounts by the eyewitnesses, including Cruthard, knowing that they "repeatedly claimed they saw nothing" but then made identifications due to threats, pressure, and being told who to identify.

¶ 73    The State filed a motion to dismiss. In 2001, the court granted an evidentiary hearing on the Hall recantation claim and denied relief on all other claims. It found that the issues with Cruthard's testimony were matters of record that could have been raised on direct appeal and that the supreme court addressed the credibility of his testimony so that it was *res judicata*.

¶ 74    In 2004, the State filed a motion to reconsider the granting of an evidentiary hearing in light of Javan's postconviction appeal (*People v. Deloney*, 341 Ill. App. 3d 621 (2003)) in which the appellate court found Hall's recantation failed to sustain a constitutional issue so that the summary dismissal of Javan's petition was not erroneous. The State also filed a motion to dismiss the actual innocence claim based on Hall's recantation, which the circuit court granted in 2008.

¶ 75    On appeal, defendant contended that he made a substantial showing on the first three aforesaid claims; that is, he did not contend that the State knowingly used Cruthard's false testimony. *People v. Brooks*, 2012 IL App (1st) 090104-U, ¶ 2. We remanded for an evidentiary hearing on the ineffective assistance claim, finding that Branch's alibi evidence was not contrary to trial counsel's strategy of attacking the eyewitness identifications of defendant (*id.* ¶¶ 18-19) and that the record did not either show or refute that counsel made a strategic decision to not call Branch. *Id.* ¶ 21. However, we affirmed the dismissal of the actual innocence claim based on Hall's recantation, noting the decision in Javan's appeal. *Id.* ¶¶ 26-27. There, "this court found that her affidavit failed to present the gist of a constitutional claim of actual innocence because, as is the case here, defendant offered no explanation as to why the facts in that affidavit were of such a character that they could not have been discovered when she testified at trial." *Id.* ¶ 27 (citing

*Deloney*, 341 Ill. App. 3d at 633). We also affirmed the dismissal of the *Brady* claim, noting that defendant never alleged that he gave a coerced statement or identified any witnesses as having been abused. *Id.* ¶ 25.

¶ 76                                      E. Instant Postconviction Proceedings

¶ 77    In 2014, following remand, defendant sought leave to file an amended petition. In addition to the remanded ineffective assistance claim based on alibi, he alleged that Cruthard recanted his trial testimony and averred that he did not see who shot him in 1991 and that Maurice, Javan, and Milsap averred to torture and mistreatment by police in this case. He claimed that he (1) was denied due process by the State knowingly using Cruthard's false testimony, (2) is actually innocent because all eyewitnesses including Cruthard recanted their identifications, and (3) was denied due process by the State's *Brady* violation in not disclosing evidence that police physically coerced statements implicating him. Attached to the motion was the draft amended petition, including the affidavits of Cruthard and of Maurice, Javan, Milsap, and another in support of the coercion claim.

¶ 78    Cruthard averred in 2013 that he "did not see who shot me" and "never saw who was in the vehicle from which shots were fired" in August 1991. He identified defendant as the shooter because he was shown a photograph of defendant by the ASA on defendant's case who said that they already knew defendant shot Cruthard, despite Cruthard telling the ASA that he did not see who shot him as it was dark and the incident happened too fast. When Cruthard was in jail on a drug offense in 1991, the same ASA told him that if there was anything he could say on Cruthard's behalf, he would. Cruthard averred that his affidavit was not the result of any threat or promise.

¶ 79    The State moved to strike the amended petition, arguing that the case was in the circuit court on remand to consider only the ineffective assistance claim based on alibi but noting that

counsel could seek leave to file a successive petition. Defendant then filed a motion for leave to file a successive petition raising the same new claims as the aforesaid motion for leave to file an amended petition. The court granted leave to file a successive petition in June 2015.

¶ 80    The State filed a motion to dismiss the successive petition in 2016. Regarding Cruthard, the State argued that his affidavit raised no new allegations and that defendant's due process claim regarding Cruthard had been rejected by reviewing courts. The State noted that Cruthard had initially told police that he did not see the shooters. The State also argued that the allegations in the petition as amended did not support an actual innocence claim, codefendants' claims of abuse were not material to defendant's case because their trials were severed from his, and defendant's *Brady* claim was rejected in his first postconviction appeal.

¶ 81    Defendant responded to the motion to dismiss, arguing regarding Cruthard that his affidavit was new evidence as he never previously recanted his trial testimony or averred that he told an ASA that he did not see who shot him. Defendant also argued that the coercion of codefendants by officers who testified against defendant was material to defendant's case and that he was presenting new evidence in support of the coercion claim so that it was not *res judicata*.

¶ 82    Defendant filed a supplemental petition to the successive petition in November 2016, reiterating his argument that Cruthard's affidavit was the first evidence that he told an ASA he could not identify the shooters and arguing that the State was aware his trial testimony was false. Defendant added claims that trial and appellate counsel were ineffective for not challenging the use of Cruthard's perjured testimony and that the State's use of Cruthard's knowingly perjured testimony was a *Brady* violation. He also claimed that the trier of fact would have weighed the police testimony differently had it known of the coercion of codefendants by those officers.

Defendant noted that McWeeny testified in the hearing on the motion to suppress identifications that Javan implicated defendant and argued that his right to due process was violated by the use of coerced statements.

¶ 83    The State responded to the supplemental petition, reiterating its argument that it was in the trial record that Cruthard had denied seeing the shooters, and indeed was the subject of cross-examination at trial, so that his affidavit was not new evidence but merely cumulative. The State argued that the record reflected Cruthard's denial to police that he saw the shooters so that not disclosing a subsequent repetition of that denial to an ASA was not a *Brady* violation.

¶ 84    The court granted the motion to dismiss the successive petition in June 2018. It found regarding Cruthard that his statement that he did not see the shooters was not new, nor was it new that he was a reluctant witness, so that his identification of defendant was extensively examined at trial and reviewed by the supreme court on direct appeal. The court also found that the coercion claims were not material in defendant's case and the *Brady* claim was disposed of in the first postconviction appeal. Defendant timely appealed the dismissal of his successive petition.

¶ 85                                III. ANALYSIS

¶ 86    Defendant contends on appeal that that the dismissal of his petition was erroneous because he made a substantial showing that the State knowingly used Cruthard's perjured testimony to obtain his conviction.

¶ 87    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a mechanism by which those under criminal sentence can assert their convictions were the result of a substantial denial of their rights under the federal and State constitutions. *Id.* § 122-1(a)(1). A defendant who files a postconviction petition must make a substantial showing of a violation of a

constitutional right to survive a motion to dismiss the petition. *People v. Dupree*, 2018 IL 122307, ¶ 28. In determining whether such a showing has been made, all well-pled facts in the petition not affirmatively refuted by the record must be taken as true. *Id.* ¶ 29. We review *de novo* the dismissal of a postconviction petition upon the State's motion to dismiss. *Id.*

¶ 88     The State's knowing use of perjured testimony to obtain a criminal conviction violates due process of law. *People v. Perkins*, 2020 IL App (2d) 170963, ¶ 40. The defendant bears the burden of establishing that the State used perjured testimony. *Id.* The State is charged with knowledge of its agents, including the police. *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 66. A conviction obtained by knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the verdict or judgment of conviction. *Perkins*, 2020 IL App (2d) 170963, ¶ 40.

¶ 89     The recantation of testimony is generally regarded as unreliable, especially where it might have resulted from duress or perceived threat. *People v. Jackson*, 2020 IL 124112, ¶ 67.

¶ 90     Here, defendant has presented Cruthard's affidavit that he did not see who shot him or who was inside the taxi from which the shots were fired and that he told an ASA before trial that he did not see who shot him. This evidence is new in the sense that it is not merely cumulative of trial testimony: Cruthard testified that defendant was one of the shooters and now avers that he did not see who shot him. However, the trial evidence included that Cruthard initially told police that he did not see who shot him. Thus, the issue of Cruthard giving accounts exculpatory of defendant as well as inculpatory accounts was firmly before the trial court and weighed with the other evidence when the court found defendant guilty. In other words, the trial evidence already established the State's awareness that Cruthard denied seeing who shot him before he changed his account and

identified defendant. We find that the new evidence of Cruthard's affidavit is not so different from the trial evidence as to create a reasonable likelihood of a different outcome.

¶ 91   Defendant emphasizes that all the witnesses who ever identified him as a shooter have recanted so that Cruthard's recantation should be seen against that backdrop in reaching a conclusion that there is at least a reasonable likelihood of a different outcome. However, two of those recantations were squarely before the trial court. Epton testified that he did not see who shot him, and his statement to codefendant Javan's counsel, in which he identified defendant as a shooter, was entered into evidence. Taylor identified defendant at trial and then recanted in a posttrial motion upon which the trial court found that it would not have changed its judgment.

¶ 92   On direct appeal, our supreme court found the evidence sufficient to convict defendant despite those recantations. *Brooks*, 187 Ill. 2d at 134. "Taylor's recantation was made under suspicious circumstances," including Rhonda's testimony "that Taylor told her that he was being forced to change his testimony, the fact that "Taylor's recantation came during a truce between the Gangster Disciples and the Black Disciples," the evidence that he "denied that he came to court [for his recantation] with a man seated in the back row, but later left the courtroom with that man," and Detective Kill's testimony "that Taylor was being threatened by the Black Disciples when he gave his original statement." *Id.* at 133. As to Epton, "the trier of fact could have reasonably believed that the statement Epton gave that implicated defendant was truthful and that its subsequent recantation was untruthful." *Id.*

¶ 93   Since then, Hall has recanted. This court did not find her recantation decisive in Javan's postconviction appeal (*Deloney*, 341 Ill. App. 3d at 633) or in defendant's first postconviction appeal. *Brooks*, 2012 IL App (1st) 090104-U, ¶¶ 26-27. As has defendant herein, Javan raised the

"assertion that all of the eyewitnesses have recanted their previous testimony" *Deloney*, 341 Ill. App. 3d at 632. This court stated that "even if defendant had alleged the State knowingly used perjured testimony, the witnesses' statements that he offers would not support the claim," including "regarding Hall's recantation, [when co]defendant offers no explanation as to why the facts that she now alleges in her affidavit are of such a character that they could not have been discovered when she testified at trial." *Id.* at 633.

¶ 94     Adding Cruthard's recantation, which as we stated above is not profoundly different from the trial evidence, does not change our assessment. Stated another way, in a hypothetical new trial, Cruthard's recantation would be another piece of evidence in a case that has had allegations of pressure (admittedly from both directions, to inculpate and to exculpate defendant) and witnesses changing their accounts since before trial. When all the various accounts from then until now are considered together, instead of focusing on the recantations as defendant suggests, we do not see a reasonable likelihood of a different outcome.

¶ 95                              IV. CONCLUSION

¶ 96     Accordingly, we affirm the judgment of the circuit court.

¶ 97     Affirmed.

---

**No. 1-18-1670**

---

| | |
|---|---|
| **Cite as:** | *People v. Brooks*, 2022 IL App (1st) 181670 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 91-CR-21147; the Hon. Thomas J. Byrne, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Brian W. Carroll, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |

---