THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONNY ROSE *et al.*, Defendants-Appellants.

First District (5th Division) No. 77-1471

Opinion filed September 28, 1979.

Ralph Ruebner, of State Appellate Defender's Office, and Nancy Abrahams, law student, both of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Michael R. Sherwin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendants were convicted of armed robbery. (Ill. Rev. Stat. 1973, ch. 38, par. 18—2.) Defendant Rose received a sentence of 4 to 10 years while defendant Stuckey received a sentence of 5 to 12 years. On appeal, they contend that (1) the trial court erred in refusing to allow them to use nylon stockings as demonstrative evidence, (2) that they were denied a fair trial where the State's closing argument shifted the burden of proof to the defense, and (3) that the trial court erred in failing to declare a mistrial after a prosecution witness stated that he had been threatened.

The following pertinent facts were adduced at trial.

*For the State*

 *Ralph Crawford*

On November 22, 1974, he was employed as the general manager of a McDonald's restaurant at 107th Street and Halsted Street in Chicago. At approximately 9 a.m. or 9:30 a.m. on that date, he was working at his desk in the back room of the restaurant. The desk was five or six feet from the rear door which was used only by employees and was right next to the safe. At that time, Donna Lemon, an employee, came in the back door and then opened the door to allow two men to enter. One of them carried a "sawed-off shotgun." Crawford was able to recognize the men as regular customers even though they wore nylon stockings over their faces. He identified the taller man who carried the shotgun as defendant Stuckey and identified the second man as defendant Rose. He testified that prior to November 22, 1974, defendants had "come in all the time, you know, buying hamburgers." Defendant Stuckey told him, "it was a

stick-up." He replied that he would not give them trouble. He stood approximately a foot and a half from defendants. Rose gave him a cloth bag and Stuckey told him to fill the bag with money from the safe. He filled the bag with $300 in coins, but when he told Stuckey that he did not have a key for the currency, Stuckey hit him with the gun. Stuckey then demanded his wallet. Defendants then pushed him down a stairway and fled. He immediately called the police.

At approximately 1:30 a.m. the next day he was asked to come to the police station to make an identification. He viewed a six-man lineup and identified the two defendants as the men who had robbed him.

On cross-examination he admitted that he had no particular reason for remembering defendants as restaurant customers. He stated, however, that defendants "had been in there a lot so I did remember these two guys." Although he was not certain, he believed the incident lasted approximately 10 minutes. He stated that the nylon stockings had "very, very little" effect upon defendants' faces and that "[t]here was nothing to stop me from recognizing these two guys."

### Donna Lemon

On November 22, 1974, she was a 14-year-old high school student employed at the McDonald's restaurant in question. At 9 a.m. on that day she was in an alley behind the restaurant with defendants and two unknown males. She had known both defendants for approximately two years prior to that day. Defendants and the two other individuals "were talking about whether they were going to go ahead and rob McDonald's or not." Stuckey told them to "do it." She could not recall whether Rose said anything. Stuckey "went around the front of McDonald's to check and see if anybody was there." Stuckey had told her earlier that they were going to rob the restaurant.

She then went to the back door of the restaurant because she was getting ready to start work. Two of the four individuals came to the door behind her; she did not see where the other two went. When she knocked on the door another employee let her in the restaurant. As she pulled the door closed behind her, "one of the dudes that followed" her grabbed the door. When she entered she observed that Rose had also come into the restaurant. Crawford was sitting at his desk and turned to look at her. She then walked down the stairs to the basement.

Several days before the robbery Stuckey asked her whether McDonald's had a safe and a security guard. She told him that the safe was in the back, but that she did not know whether there was a security guard. Stuckey telephoned her at about 10 p.m. the night before the robbery and told her, "that they were going to go ahead and stick the place up." When she told Stuckey she was going to be at work at 9 a.m.,

Stuckey said they were going to come in the back door behind her. Stuckey called her again the next morning to make sure she would be at work.

Stuckey called her at about 6:15 p.m. on the day of the robbery; he told her they were counting the money and that she would get her share. When she told Stuckey that the police were then at her home, he said, "Don't worry about it; it is just routine."

She further testified that Rose was at her home the night before she was to testify in court. Rose asked her, "to do him a favor" and said that, "he knew he was guilty but he just didn't want to go to the pen."

On cross-examination she admitted that she did not contact the police when she first learned of the robbery plans and that she expected to receive some of the proceeds. She further admitted that on the morning of the robbery she waited for defendants in the alley because she wanted to participate in the robbery. Stuckey told her what to do. She was to leave the back door open so that the men could enter the restaurant themselves. She did not actually hear or see anyone come into the restaurant behind her, but she believed the boys opened the door just as she reached the basement steps. She did not come up from the basement until the robbery was over. While she was in the basement Rose came down. Although he was wearing a stocking mask she was able to "get a good look at his face." Although the stocking was "tight" it did not completely distort his face.

She admitted that she "bragged" about being involved in the robbery while in the basement. She did not tell the police of her involvement until after 6 p.m. that day.

On redirect examination she testified that she saw Rose and another person at the back door when she entered. She did not know the identity of the second person.

*James Fitzmaurice, Chicago Police Officer*

On November 22, 1974, he was assigned to investigate the armed robbery of a McDonald's restaurant. At approximately 6 p.m. on that day he and his partner interviewed Donna Lemon at her home. During the conversation Donna received a phone call. Following the conversation the officers proceeded to 119th and Sangamon where they observed defendant Rose. His partner took Rose into custody. They next proceeded to defendant Stuckey's residence and placed him under arrest.

*For the Defendants*

*William C. Hudson, Chicago Police Officer*

He was assigned to investigate the armed robbery in question. During his investigation he interviewed Ralph Crawford. Crawford

stated that when he opened the door to allow an employee to enter, "two men came in behind the employee and displayed a shotgun and told him it was a robbery." After Crawford told the men he could not open the safe, one of them struck him in the head with the shotgun. Crawford stated that the men then took his wallet and removed $300 in currency from the safe.

On cross-examination he admitted that his police report, from which he refreshed his recollection, contained only a summary of what Crawford told him.

*Sidney Rhim Sarif, Chicago Police Officer.*

On November 22, 1974, he was known as Sidney Clark. On that date he was assigned to investigate the armed robbery in question. At approximately 2 a.m. on November 23, 1974, he interviewed Ralph Crawford concerning the robbery. Crawford stated that he opened the door to allow Donna Lemon to enter and that she was followed by two men, one of whom had a sawed-off shotgun. One of the men struck Crawford on the head. The men then forced Crawford to give them the money from the safe.

OPINION

Defendants first contend that the trial court erred in refusing to allow them to use nylon stockings to demonstrate to the jury the extent to which such stockings distort facial features. Crawford, the restaurant manager, had testified that, although they wore nylon stockings over their heads during the robbery, he had no difficulty in recognizing defendants. Defendants argue that such a demonstration would have aided the jury in assessing Crawford's ability to recognize them during the robbery. Defendants concede that the nylon stockings which they sought to use at trial were not the ones actually worn during commission of the crime.

■■ The admissibility of courtroom demonstrations is clearly a matter resting within the sound discretion of the trial court. (*People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 356 N.E.2d 891.) We will not interfere with the exercise of that discretion in the absence of an abuse to the prejudice of the accused. (*People v. Navis* (1974), 24 Ill. App. 3d 842, 321 N.E.2d 500.) In reviewing the trial court's exercise of discretion we will consider primarily whether the proposed demonstration would be:

> "(1) probative of the facts in issue and (2) conducted under substantially similar conditions and circumstances as those which surrounded the original transaction or occurrence." *People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 1022, 356 N.E.2d 891, 897.

■■ In the instant case defendants clearly failed to establish that the demonstration would be conducted under conditions and circumstances substantially similar to those existing at the time and place of the robbery.

As defendants readily concede, they did not intend to use the stockings actually worn by the robbers. Rather, defendants intended to elicit a description of the actual stockings from Crawford and then select similar stockings for use in the demonstration. However, as the trial court properly reasoned, it is unlikely that Crawford could describe the stockings other than to say that they were of such a quality as to enable him to easily recognize the individuals wearing them. Crawford remained very positive in his testimony that he was able to recognize defendants despite the stockings. Even a slight variation in color, texture, size or transparency might substantially alter the effect of the stockings upon the facial characteristics of the person wearing them. Rather than assisting the jury, a demonstration using stockings other than those actually worn by the robbers or ones identical thereto might likely confuse or mislead the jury. We, therefore, believe the trial court properly exercised its discretion in prohibiting the demonstration.

Defendants next contend that certain comments made by the prosecutor during closing argument shifted the burden of proof to the defense and thereby denied them their right to a fair trial.

The prosecution clearly bears the burden of proving beyond a reasonable doubt all the material facts constituting a crime. (*People v. Benson* (1960), 19 Ill. 2d 50, 166 N.E.2d 80.) This burden of proof does not at any time shift to the accused, but remains with the prosecution throughout the trial. *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.

During closing argument in the instant case the prosecutor told the jury to ask defense counsel to "explain away" the fact that defendants certainly committed the armed robbery. He also told the jury to ask defense counsel to explain the various conversations between Donna Lemon and defendants in which defendants made incriminating statements. Finally, the prosecutor suggested that the jury ask defense counsel why witnesses Lemon and Crawford would give false testimony. ■■ We believe these comments, although perhaps not explicitly nor flagrantly, may have tended to shift the burden of proof to defendants by requiring them to "explain away" the State's case. Defendants, of course, did not have a burden of introducing evidence to create a reasonable doubt of guilt. *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.

However, we do not believe that the prosecutor's isolated comments here were so prejudicial as to require a reversal of the convictions. We will reverse a conviction on the basis of improper argument only where the remarks constitute a material factor in the conviction. (*People v. Swets* (1962), 24 Ill. 2d 418, 182 N.E.2d 150; *People v. Moore* (1978), 61 Ill. App. 3d 694, 378 N.E.2d 516.) Although the remarks here were improper, they were offset by the prosecutor himself when he explicitly stated

several times during closing argument that the State had the burden of proving defendants guilty beyond a reasonable doubt. (See *People v. Vinson* (1978), 61 Ill. App. 3d 684, 378 N.E.2d 348.) Moreover, immediately following the remarks the trial court instructed the jury that the State had the burden of proof. Considering the incidental nature of the improper comments, the subsequent correct statements of law from both the trial court and the prosecutor, and the overwhelming evidence of defendants' guilt, we are convinced that the error did not contribute to the convictions. Accordingly, we find the error here to be harmless.

Defendants finally contend that the trial court erred in failing to grant a mistrial when a prosecution witness stated that he had been threatened. On cross-examination defense counsel asked Ralph Crawford, the complaining witness, the location of his residence at the time he initially received a phone call from the police. Defense counsel stated that he wished to calculate the travel time from Crawford's residence to the police station. In response to the trial court's direction to give the location, Crawford stated:

> "I have been threatened and I don't want to give out my address. I have been threatened by people."

■■ The State initially argues that no error occurred in admission of Crawford's response because the testimony was procured by defendants. The State's reliance upon *People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651, in support of its argument is, however, clearly misplaced. In *Burage* the testimony complained of, although improper, was responsive to defense counsel's questioning. In the instant case Crawford's statement that he was threatened was obviously unresponsive to the question. Generally, where a witness gives an answer which is not responsive to the question asked, the unresponsive answer will be stricken upon proper motion. (See *People v. Burris* (1971), 49 Ill. 2d 98, 273 N.E.2d 605.) We therefore reject the State's argument that defendants are barred from objecting to the admission of testimony which, although elicited during examination by their own counsel, was not responsive to the question.

■■ However, we do not believe the trial court erred in refusing to declare a mistrial following Crawford's statement. A motion for a mistrial is addressed to the sound discretion of the trial court. (*People v. Richards* (1970), 120 Ill. App. 2d 313, 256 N.E.2d 475.) In exercising this discretion the trial court must determine whether the jury has been influenced and prejudiced to such an extent that they would not, or could not, be fair and impartial. (*People v. Gambino* (1957), 12 Ill. 2d 29, 145 N.E.2d 42.) We do not believe the witness' comment here was so prejudicial as to prevent the jury from rendering a fair and impartial verdict. Moreover, the trial court struck the reference to threats from the record and instructed the jury to

disregard the answer, thus curing any possible error. (*People v. Naujokas* (1962), 25 Ill. 2d 32, 182 N.E.2d 700.) Accordingly, the trial court did not err in refusing to grant a mistrial.

■ In conclusion we note that defendants are guaranteed a fair trial, but not one necessarily free of error. (*People v. Ashley* (1960), 18 Ill. 2d 272, 164 N.E.2d 70, *cert. denied* (1960), 363 U.S. 815, 4 L. Ed. 2d 1157, 80 S. Ct. 1255.) Where it appears that the errors in the record could not reasonably have affected the result, those errors are harmless. (*People v. Castillo* (1976), 40 Ill. App. 3d 413, 352 N.E.2d 340.) After carefully reviewing the entire record before us, and considering the overwhelming evidence of defendants' guilt, we are convinced that any error occurring at trial was harmless beyond a reasonable doubt and did not prevent defendants from receiving a fair trial.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.