THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DONALD KEITH ELLIS, Defendant-Appellant.

First District (2nd Division)    No. 79-2333

Opinion filed February 3, 1981.

Ralph Ruebner and Nancy Abrahams, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and Alfred Petrocelli, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant, charged by information with murder and armed violence, was convicted of both offenses in a bench trial, but sentenced to 6 years in the penitentiary on the armed violence offense only. On appeal he claims denial of a fair trial because the State destroyed certain evidence which, according to defendant, would have been a key factor in his defense. For the reasons set forth below, we affirm.

At trial the State presented the following evidence. Billy Downer testified that on September 4, 1978, he, Irving Johnson (the victim), Mark Green and Tony Hill stole some merchandise from a department store and proceeded toward 4017 W. Monroe Street, Chicago, the home of David Shine. On their way, they met defendant, Larry Mason and a third man who followed them to Shine's house. Downer went to the basement with Shine and Green, and Johnson went upstairs with defendant and the other two men. Downer later walked upstairs and saw Johnson fighting with defendant and Mason, which lasted about 30 seconds. Downer saw no weapon during this fight. Johnson then ran away and defendant threw a stick at him and said "who was that, I'm going to kill him." A short time later, Downer and Johnson came to the front porch of 4017 W. Monroe. Johnson again left and returned about five minutes later. As he reached the curb, defendant ran toward him and said "I told you I was going to kill you." He then shot Johnson from three or four feet away. After the first shot, Johnson turned to leave but ran into a car. As he fell, defendant continued to fire the gun. Downer saw no weapon in Johnson's hand. Downer was 15 to 20 feet away from defendant and Johnson when he observed this shooting.

David Shine testified that after Downer, Green and Johnson came to his house with the stolen merchandise, defendant tried to take some clothes from Johnson and a fight ensued. He saw no weapon during the fight, and after Johnson ran off, defendant said "who was that, I'm going to kill him." Shine later heard the shooting, but did not see it. Sandra Shine saw defendant shoot Johnson as he was walking across the street towards her house. She saw no weapon in Johnson's hand. She initially denied knowledge of the shooting. She told two police officers the next day that Johnson did not have a knife at the time of the shooting. Sandra's younger sister thereafter pointed to a knife in the yard next door and the police took custody of it.

Debra Jones, who lived at 4017 W. Monroe and was sitting on the front porch, testified that Downer and Johnson were talking in front of the house; then Johnson left. Johnson returned 15 minutes later and as he was crossing the street toward them, defendant ran out, fired one shot

and said "I told you I was going to kill you." Johnson fell onto a car. Defendant moved closer and fired four or five more shots. She saw no knife in Johnson's hand. Defendant ran, dropping the gun, which police later recovered. She went to Johnson after the shooting and saw no knife.

Officer Paul Whittenhall testified that while investigating the shooting, he recovered a .38 Colt special at 4019 W. Monroe, which he inventoried. He identified People's exhibit No. 2 as the inventory form he filled out concerning this gun. Prior to joining the police force, he had been employed as an armorer in the military, which entailed repairing small weapons. He had had experience with the type of weapon recovered and said that there was "no way whatsoever" that this type of weapon could be fired in an automatic fashion. Every time the gun is fired, the trigger would have to be pulled; if the trigger was held in a pulled position the gun would not continue to fire. There was no objection to this testimony. He then stated that the gun was destroyed by the police at Inland Steel on October 9, 1979, which was the first day of the trial. Whittenhall gave his testimony on October 11, 1979.

On cross-examination, Whittenhall testified that there was no court order commanding the gun's destruction. He did not test this gun and did not know if it had a "hair trigger." With a hair trigger, less pressure is required to pull the trigger in order to fire the gun. On redirect examination, he testified that when he arrived at the scene, members of the crowd directed him to the location of the gun. Whittenhall was never asked for, nor did he offer, an explanation for the gun's destruction.

Defendant's motion for a finding in his favor at the close of the State's case-in-chief was denied and defendant then presented the following evidence. Rosie Lee testified that on the night in question, defendant came to her home at 4013 W. Wilcox, Chicago. He had a cut across his forehead, and was bloodied. He washed the blood off his face and left about 10 minutes later. She did not notice the length of the cut, nor did she attempt to treat it. Carl Edward Lee testified that he was present when Johnson and defendant were fighting and saw Johnson cut defendant on the head with a knife. Defendant then fled. About 20 minutes later he saw defendant standing near Monroe and Pulaski. Johnson ran across the street toward defendant, near 4011 or 4015 W. Monroe. Johnson drew a knife when he was five or six feet away from defendant. Defendant had a gun in his hand and shot Johnson four or five times. Lee had been convicted for armed robbery and was on probation.

Police officer Thomas Bloomstrand contacted Sandra Shine on September 5, 1978, during his investigation of the case and testified, after refreshing his recollection from his report, that she told him that Johnson had a knife in his hand at the time of the shooting, contrary to her

testimony during the State's case in chief. On cross-examination, he testified that Sandra Shine directed him to a knife, which had no handle, blood or red stain on it when he found it in a yard under some debris.

Defendant testified that 30 minutes before the shooting he and Johnson had an argument. Johnson stabbed him in the head. Shortly afterwards, he went to Rosie Lee's house, stayed there for 10 or 15 minutes, and went to the intersection of Monroe and Pulaski where three or four friends joined him. Johnson then came across the street toward him and defendant began to back up. After Johnson pulled out a knife, "some guy" passed defendant a pistol. "Then I just started firing. * * * I'd say I fired the gun at least about four times," when Johnson was about four or five feet away. He could not describe Johnson's knife in any particular and could not identify the exhibit retrieved by Officer Bloomstrand. Defendant then ran away and threw the gun into a gangway. After he was arrested, in a written, signed statement, he denied the shooting because he didn't want to go to jail. Defendant had never fired a gun before and had never been convicted of any crime.

On cross-examination, defendant again testified that he shot Johnson about four times. The state's attorney then asked the following questions and defendant responded with the following answers.

"Q. What were you thinking when you first shot the gun at him?
A. What was I thinking? * * * I wasn't thinking about nothing. I was just nervous and upset, man.
Q. You shot him the first time.
A. When you're pulling the trigger you just can't stop pulling it.
Q. You couldn't stop pulling the trigger once you started?
A. No.
Q. How many times did you pull the trigger?
A. I had to pull it about 4 times.
* * *
Q. Did it have a cylinder that revolves every time you pulled the trigger, the gun you used to shoot Mr. Johnson?
A. Yes, it did have a cylinder.
Q. And a hammer that would come back every time you pull the trigger?
A. I don't know all that.
Q. It doesn't fire automatically, does it?
A. I don't know. It didn't fire automatic when I shot."

The trial court then found defendant guilty of armed violence. The record does not include any post-trial motion for a new trial.

Defendant's principal contention is that Officer Whittenhall's testimony relating to the gun allegedly used by defendant should have been excluded because the gun was deliberately destroyed by police, without a

court order, on the first day of trial, thereby depriving the defense of a meaningful opportunity to rebut critical evidence againt him and denied him a fair trial. Although defense counsel did not object to the testimony or ask that it be stricken, defendant contends on appeal that plain error resulted from the gun's destruction because the gun was a crucial part of his self-defense theory, relying upon Supreme Court Rule 615(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a)), and claiming that the rule applies to criminal cases where the evidence is closely balanced, citing *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856. Contending that the level of force employed by a defendant is relevant to the issue of self-defense (Ill. Rev. Stat. 1979, ch. 38, par. 7—1; *People v. Jackson* (1975), 35 Ill. App. 3d 215, 221, 340 N.E.2d 673), defendant asserts that had he been able to show that the gun had a hair trigger, he could have established that a single depression of the trigger resulted in unintentional rapid firing of the gun; and that a showing of the intent to fire one, rather than multiple, bullets was relevant to establishing the reasonableness of the force he used. Specifically, defendant insists that Whittenhall's testimony that the gun could not be fired in an automatic fashion was improper because defendant did not have access to the gun in order to refute this testimony.

■■ We strongly disapprove of the State's action in destroying the gun, whether intentionally or inadvertently. The absence of the gun was clearly not prejudicial to defendant's case, however, for a number of reasons. The very fact which defendant now claims he could have proven below by the use of the gun, *i.e.*, that it possessed an automatic firing feature, was not at all supported, and in fact was clearly contradicted, by defendant's own testimony at trial. He testified that he couldn't stop *pulling* the trigger; that he *pulled* the trigger four times; and that *the gun did not fire automatically* when he shot it. Defendant cannot now claim that he was deprived of the opportunity to disprove Whittenhall's testimony concerning the absence of an automatic firing feature when defendant himself stated that the gun was not so used and had no such feature in his narrative of the occurrence. The trial court had a convincing basis in the evidence to believe that defendant deliberately pulled the trigger four times and shot at least four bullets into the body of the victim. Defendant, therefore, has suffered no prejudice because neither the gun's destruction nor Whittenhall's testimony could have reasonably affected the outcome of this case. *People v. Rose* (1979), 77 Ill. App. 3d 330, 395 N.E.2d 1081; *People v. Mathis* (1977), 55 Ill. App. 3d 680, 371 N.E.2d 245; *People v. Lawson* (1977), 52 Ill. App. 3d 343, 367 N.E.2d 560.

It is noteworthy that defendant's testimony both on direct and on cross-examination is totally devoid of any suggestion that he intended to pull the trigger only once and fire only one bullet. The only testimony defendant relies upon to support his intent theory is his cross-examination statement that, "when you're pulling the trigger you just can't stop pulling

it." According to defendant, this statement allows the inference that he intended to shoot only one bullet, but multiple shots inadvertently resulted. We cannot agree. A closer reading of the record shows, in the context of the testimony immediately preceding it and following it, that defendant was describing his rage at the moment, not a mechanical feature of the gun, which caused him to repeatedly fire the weapon. The only other indication in the record of an intent to fire but one shot appears in defense counsel's remark in his opening statement, which thereafter never was substantiated by the evidence.

■■ It is significant that the defense sought no pretrial examination, permission to test, or any other evidentiary use of the revolver until this appeal. No motion was made to exclude Officer Whittenhall's testimony before he testified, nor was there a motion to strike it afterward. No post-trial motion for a new trial is contained in the record, setting forth such putative prejudice in support thereof, and it is not clear that this issue was ever presented to the trial court. Defendant's present claim of the gun's materiality on appeal is therefore without merit, and the substantial prejudice required to invoke the plain error doctrine has not been shown. *People v. Precup* (1978), 73 Ill. 2d 7, 16-17, 382 N.E.2d 227.

The cases cited by defendant, *People v. Dodsworth* (1978), 60 Ill. App. 3d 207, 376 N.E.2d 449, and *People v. Taylor* (1977), 54 Ill. App. 3d 454, 369 N.E.2d 573, are distinguishable. In both, defense pretrial requests for permission to perform tests upon controlled substances were thwarted by the State's unnecessary destruction of the alleged contraband. In each case the defense had moved to exclude evidence of the results of the tests before they were admitted in evidence. In *Dodsworth*, the defense also moved to strike the damaging testimony once it was given. As we have seen in the present case, none of those steps were taken by defendant to examine, utilize, test or preserve the evidence, which would have lent credence to his claim of materiality of the weapon's existence to his defense. Most importantly, defendant's own testimony contradicts the theory sought to be pursued here. Although we unswervingly adhere to *Dodsworth* and *Taylor* in condemning the State's unnecessary destruction of what might have been potentially material evidence under other circumstances, the destruction of the revolver in this case was not prejudicial to the defense.

■■ Defendant also assigns error in the trial court's failure to exclude Officer Whittenhall's testimony on the alternative ground of irrelevancy, again as plain error since no such objection was made at trial on this ground. This argument is bottomed upon the trial court's allowance of testimony to the effect that the type of revolver involved could not fire repeatedly, even if it was possessed of a "hair trigger," because the trigger would nevertheless have to be pulled irrespective of the amount of

pressure necessary to pull it. The defense maintains that since the specific weapon was never tested by the witness, he should not have been permitted to testify concerning the pressure which would have been necessary to activate it. The entire question of whether the revolver was equipped with a hair trigger was raised by the defense in cross-examination of Whittenhall. Whether it was or was not is of no consequence in the absence of any countervailing evidence to Whittenhall's assertion that there was no way in which such a weapon could be fired automatically, without pulling the trigger for each shot, buttressed by defendant's own testimony that he did just that four times. Defendant's claim of prejudice in the admission of this testimony as irrelevant is equally without merit.

For the reasons aforesaid, we must affirm defendant's conviction of armed violence.

Affirmed.

STAMOS and DOWNING, JJ., concur.