2023 IL App (1st) 200017-U

SECOND DIVISION
September 12, 2023

No. 1-20-0017

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 17992 |
| | ) | |
| JOVAN JACKSON, | ) | Honorable |
| | ) | Ursula Walowski, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court erred in refusing to instruct jury on aggravated discharge as lesser-included offense of attempted first-degree murder. Good-faith exception to exclusionary rule applied to arrest made pursuant to investigative alert before any appellate precedent declared practice unconstitutional on state-law grounds.

¶ 2    A jury convicted defendant Jovan Jackson of the first-degree murder of Marshall Knight and the attempted first-degree murder of Jeon Woods. On appeal, defendant argues that the trial court erred (1) in denying his request for a jury instruction on aggravated discharge of a firearm, as a lesser-included offense of attempted murder; and (2) in denying his motion to suppress his custodial statement as the product of an illegal arrest. Defendant's arrest was illegal, or so he says, because it was based solely on the authority of a police-issued investigative alert, rather than a judicially-issued arrest warrant.

¶ 3 We agree that the jury should have been instructed on aggravated discharge. We thus vacate defendant's conviction for attempted murder and remand for a new trial on that charge.

¶ 4 We affirm the denial of defendant's motion to suppress. Whatever our supreme court may ultimately determine about the legality of investigative alerts under our state constitution, the good-faith exception to the exclusionary rule applies to arrests, like defendant's, that were made before any appellate precedent held this practice to be unconstitutional. Defendant's custodial statement, and any other evidence obtained as a result of his arrest, will thus remain admissible in the proceedings on remand. Defendant's first-degree murder conviction is affirmed.

¶ 5                                    BACKGROUND

¶ 6 On July 17, 2012, the Black Mob and No Limits gangs were embroiled in a feud marked by a series of shootings in the vicinity of Colfax Avenue and 79th Street, which the No Limits considered their territory. Knight, the murder victim here, was a member of the No Limits. Defendant and his brother Michael were members of the Black Mob. Two of their fellow gang members had recently been shot and wounded by the No Limits, including one earlier in the day. So they "went there and shot back," as defendant put it in his custodial statement.

¶ 7 Defendant and Michael arrived in a distinctive looking truck—mostly green, with a red hood—driven by Kimeda McGinnis. McGinnis pointed to some people and said, "that's them," meaning that they were No Limits. Defendant claimed that he did not know any of them.

¶ 8 There is some dispute about exactly how many people were there, but it seems there were at least three: Knight; Woods; and, according to Woods, another No Limits member known as "Dame." Woods, the attempted-murder victim, testified that he was not a gang member. He was a 15-year-old from the neighborhood who was on his way to meet his friends at a nearby park. He rode by on his bike, stopped to buy a drink, and then lingered for a moment to say hello to

"Dame," whom he knew from around the neighborhood. And then the shooting started.

¶ 9     The particulars of the shooting, so far as we know them, come from Woods; Terrence Hunter, who saw the events unfold from his apartment window; defendant's custodial statement; and video footage recorded by a local business's security camera. A brief synopsis, culled from these various sources, will suffice for our purposes here.

¶ 10     McGinnis pulled into an alley. The video shows defendant and Michael running down the sidewalk. Michael is a few feet ahead of defendant. His arm is extended out and he is holding a semiautomatic. (It is impossible to tell from the video whether he has started firing.) Defendant is trailing his brother while "fiddling" with his "janky" gun—a somewhat dysfunctional revolver whose cylinder would not stay closed and that had to be manually spun between each shot.

¶ 11     Knight, Woods, and "Dame" are out of frame on the video, and defendant and Michael move out of frame, too, as they approach the victims. Woods, who was just a few feet from Knight, testified that the guns were pointed toward them. When the shots began, Knight, Woods, and "Dame" turned and fled. Some more shots were fired in rapid succession. Woods was not hit, but one bullet fatally struck Knight in the back.

¶ 12     Woods and Hunter estimated that 6-8 shots were fired. The police found five .40 caliber casings and one .38 caliber cartridge at the scene. A .40 caliber semiautomatic was later found in the apartment building where the brothers lived. Knight was struck by a .40 caliber bullet. The bullet recovered from Knight, and the casings found at the scene, were all fired from that gun.

¶ 13     The evidence thus suggested that all but one of the shots were fired by Michael. And defendant said the same in his custodial interview. As he would tell the story, by the time he reached the corner, after "fiddling" with his gun, everybody had fled the area. But he "let one off," anyway, if only to keep up appearances.

¶ 14    After the shooting, Michael and defendant come back into frame on the video, running in the opposite direction from whence they came. Michael is on foot; defendant is on Woods's bike.

¶ 15    Detective Paul Alfini, of the Chicago Police Department, tracked down McGinnis, owing in no small part to her unique looking truck. McGinnis gave a statement that put defendant at the scene of the shooting. Detective Alfini assembled a photo array and a lineup; Hunter identified defendant in both. On the basis of this and other evidence, the detective issued an investigative alert for defendant's arrest on August 28, 2012. He was arrested later that day and confessed to his participation in the shooting, along with Michael.

¶ 16    After pending for nearly seven years, the case was set for trial on August 12, 2019. On July 25, the appellate court issued its opinion in *People v. Bass*, 2019 IL App (1st) 160640, *aff'd in part & vacated in part*, 2021 IL 125434. Defendant promptly moved to suppress his custodial statement based on the new rule announced in *Bass*. The trial court denied the motion.

¶ 17    The State dismissed various charges before the trial, including one count of aggravated discharge of a firearm toward Woods. The State proceeded on alternative theories of Knight's murder (intentional, knowing, and "strong probability"), and the attempted murder of Woods. The jury was instructed on accountability for both charges, and the State argued that although it would appear that Michael fired all but one of the shots, including the shot that killed Knight, defendant and Michael jointly conceived of and executed this plan to retaliate against the No Limits. With respect to the specific-intent element of attempted murder, the State argued alternative theories of direct intent (to kill Woods) and transferred intent (that is, an intent to kill Knight that applied to the offense against Woods).

¶ 18    The defense requested a jury instruction on aggravated discharge of a firearm, as a lesser-included offense of the attempted-murder of Woods. The defense argument, in sum, was that "a

reasonable trier of fact could conclude that there was no intent."

¶ 19    After initially contesting the point, the State conceded that aggravated discharge was a lesser-included offense of attempted murder. The trial court agreed. But the court found that, when defendant's accountability for Michael's conduct is taken into account, no rational jury could find defendant guilty of the lesser offense. The court thus denied the requested instruction and, in due course, sentenced him to consecutive prison terms of 40 years for first-degree murder and 21 years for attempted murder.

¶ 20                                          ANALYSIS

¶ 21                                              I

¶ 22    Defendant argues that the trial court erred in denying his request for a jury instruction on aggravated discharge of a firearm, as a lesser-included offense of attempted murder.

¶ 23    There is no dispute that aggravated discharge of a firearm was, as the trial court correctly found, a lesser-included offense of attempted murder. So we can proceed directly to the second stage of our inquiry (see *People v. Kolton*, 219 Ill. 2d 353, 361 (2006)), where the real issue is joined on appeal.

¶ 24    The parties dispute, and we must decide, "whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense." (Italics added.) *People v. Eubanks*, 2019 IL 123525, ¶ 72. We review the trial court's determination for an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42.

¶ 25    The attempted-murder charge and lesser-included offense of aggravated discharge require the same underlying conduct: shooting at or in the direction of Woods. The difference lies in the mental-state elements of the offenses. Attempted murder requires a specific intent to kill. *People v. Woods*, 2023 IL 127794, ¶ 51; *People v. Brown*, 2015 IL App (1st) 134049; see 720 ILCS 5/4-

4, 5/8-4, 5/9-1 (West 2022). Aggravated discharge only requires that shots were knowingly fired in the victim's direction, without necessarily being intended to kill anyone. 720 ILCS 5/24-1.2 (West 2022). Thus, our question is whether there was "some evidence" that rationally supported a finding of knowledge, in the sense just specified, but *not* a specific intent to kill. Two preliminary points will guide our analysis of the evidence on this issue.

¶ 26 First, because it is the State's burden to prove each element of a charged offense beyond a reasonable doubt, the requirement of "some evidence" may be satisfied by an arguable gap or weakness in the State's proof of an element, in light of which "a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater." *People v. Medina*, 221 Ill. 2d 394, 405 (2006); see also *Schmuck v. United States*, 489 U.S. 705, 716 n.8 (1989); *Keeble v. United States*, 412 U.S. 205, 208 (1973).

¶ 27 This point bears emphasis in an attempted-murder case, like this one, where the State must carry the heightened burden of proving—often through nothing more than circumstantial inferences—that the defendant acted with a "conscious objective or purpose" to cause death, and nothing less. 720 ILCS 5/4-4 (West 2022). If the jury could rationally conclude that the State's proof fell anywhere short of this demanding mark, the trial court should grant a request for a lesser-included instruction that requires proof of a less culpable, and inevitably less demanding, mental state that could rationally be inferred from the evidence.

¶ 28 Second, a failure to instruct the jury on a lesser-included offense that was supported by "some evidence" is reversible error that warrants a new trial. *Eubanks*, 2019 IL 123525, ¶¶ 77, 85. The error is neither obviated nor rendered harmless, as the State contends, by the mere fact that the evidence was sufficient for the jury to convict the defendant of the greater offense.

¶ 29 The State's assertion conflates two different inquiries that are governed by different legal

standards and that call for different remedies (a new trial versus an outright reversal) when the defendant prevails. We regret that some errant remarks of ours, dusted off and cited here by the State, support this confused position. See *People v. McClellan*, 232 Ill. App. 3d 990, 1008 (1992) (quoting *People v. Fonville*, 158 Ill. App. 3d 676, 685 (1987)). But these remarks never gained traction in our later precedents, and we will not start following them now.

¶ 30     The evidence is sufficient to support a conviction on a greater offense if "*any* rational trier of fact could have found the essential elements of the [greater] crime beyond a reasonable doubt"—even if another, equally rational, trier of fact (the reviewing court, for example) could reach a different conclusion. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

¶ 31     When a defendant requests a jury instruction on a lesser-included offense, the trial court should grant the request if a rational trier of fact, that is, *any* rational trier of fact, could find him guilty of only the lesser offense. *Medina*, 221 Ill. 2d at 405; *Schmuck*, 489 U.S. at 716 n.8; *Keeble*, 412 U.S. at 208. This doesn't preclude the possibility that another, equally rational, trier of fact could reach a different conclusion—namely, that the greater offense was proven.

¶ 32     The standard for instructing on a lesser-included offense thus shares a key premise with *Jackson*'s sufficiency-of-the-evidence standard: that triers of fact can *rationally* disagree about the presence of reasonable doubt. Indeed, this kind of disagreement is exactly what a lesser-included instruction is meant to address. See *People v. Bryant*, 113 Ill. 2d 497, 502 (1986) (lesser-included instruction "provides an important third option to a jury" that finds a defendant culpable but is conflicted as to extent of the crime).

¶ 33     Thus, even granting that the evidence was sufficient to convict defendant of attempted murder, as the State argues, this point does not settle the issue before us. Our question, rather, is whether aggravated discharge was *one* rational view of defendant's crime against Woods,

perhaps among others; or whether the State offered such conclusive and undisputed proof of specific intent to kill that the jury's *only* rational option was to convict defendant of attempted murder. With all of that said, we turn to the facts of the case and the evidence of specific intent.

¶ 34    First things first: defendant does not dispute that he was accountable for Michael. They were, no doubt, engaged in a "common criminal design" when they went to the corner together, armed and looking to retaliate against the No Limits for the recent attacks on their fellow gang members. 720 ILCS 5/5-2 (West 2022). So evidence of a specific intent to kill can include any manifestations of such an intent either by defendant himself or by Michael.

¶ 35    There is no evidence that either defendant or Michael directly expressed a specific intent to kill Woods or anyone else during the shooting. Granted, such direct and conclusive evidence is neither the norm nor necessary for a finding of specific intent; but it does happen, perhaps more frequently than we are apt to assume. (A Westlaw search for just one blunt expression of specific intent, "I told you I was going to kill you," yields upwards of 10 results. Here are two: *People v. Williams*, 186 Ill. 2d 55, 58 (1999); *People v. Ellis*, 93 Ill. App. 3d 79, 80 (1981)).

¶ 36    Gang members, in particular, have been known to announce their specific intent to *kill* their rivals, when that truly is their intent, by shouting slogans like "King Killer," or "Disciple Killer," or "Cobra Killer," while shooting at members of the rival gang. See, *e.g.*, *People v. Brooks*, 2022 IL App (1st) 181670, ¶ 25; *People v. Cavazos*, 2022 IL App (2d) 120444-B, ¶¶ 8, 27-28; *People v. Simon*, 2011 IL App (1st) 091197, ¶¶ 12-13; *People v. Salgado*, 287 Ill. App. 3d 432, 435 (1997). This shooting was part of a gang feud, but as far as the record shows, nothing like that was said.

¶ 37    Nor did defendant admit in his ERI that he, or to his knowledge, Michael, specifically intended to kill anyone. What he said was that the No Limits shot at them, so they "went there

and shot back." If he meant that they were shooting to kill, he never said so out loud. He did not, for example, say that they went to avenge the killing of a fellow gang member, or even that the No Limits had recently killed any Black Mob members in the first place. Rather, the background facts were that the No Limits had shot and wounded two Black Mob members—and posted an online video "dissing" the gang.

¶ 38    Intentionally killing some No Limits would have been a deliberate escalation of the feud, not just tit-for-tat retaliation, or an attempt to scare the No Limits into backing down, or at least to show the No Limits that the Black Mob was not scared of them. To be sure, an escalation is what they got, and if nothing else, that was an outcome they knowingly risked by resorting to gunfire. But so far there is no unassailable evidence that it is what they specifically intended.

¶ 39    The State notes that defendant never offered any evidence that they *didn't* intend to kill anyone, but only, say, to scare them. True enough. But although that evidence surely would have strengthened his request for an aggravated-discharge instruction, it wasn't defendant's burden to produce affirmative evidence of a less culpable mental state; it was the State's burden to produce evidence of the mental state it charged. And if the State's evidence left room for rational debate and disagreement about how much culpability was proven, defendant was entitled to a lesser-included instruction. So far that looks to be the case.

¶ 40    Since there were no direct expressions of a specific intent to kill, we have little more to go on than the shooting itself and its general gang-feud context. Let's recap the relevant facts. Defendant took McGinnis at her word when she said that a group of people—Woods, Knight, and "Dame"—were No Limits. Defendant didn't know any of them, and so he didn't know that Woods was not a gang member. (As far as we know, the same goes for Michael.) Defendant and Michael advanced, guns in hand, and Michael started shooting, while defendant mostly

"fiddl[ed]" with his "janky" gun. Knight, Woods, and "Dame" immediately fled. It appears that a total of six shots were fired, all but one by Michael. Knight took a fatal bullet in the back; the others escaped uninjured.

¶ 41    How might a rational juror view the offenses committed against Knight and Woods? For starters, there is no reason to think that Michael or defendant targeted anyone in particular, to the exclusion of anyone else; after all, as defendant said in his ERI, he didn't know one from the next. (So the fact that Woods was not a gang member—a point emphasized by defendant, despite being unknown to him at the time—doesn't bear on the issue of intent.) Rather, the evidence shows that Michael indiscriminately opened fire toward the victims.

¶ 42    With that conclusion in place, rational jurors could find that the indiscriminate gunfire, toward a group of people who were all thought to be members of the rival gang, was intended to kill *everyone*. That would amount to an intentional murder of Knight and an attempted murder of Woods. But for all the reasons we have given, rational jurors could remain unconvinced by the State's inference of specific intent. They could thus find a "strong probability" murder of Knight (see 720 ILCS 5/9-1(a)(2) (West 2022)), and an aggravated discharge of a firearm at Woods.

¶ 43    The State views the evidence of a specific intent to kill Knight as particularly strong. And on the State's view, this supports an attempted-murder conviction, with respect to Woods, based on a theory of "transferred intent:" if Knight's murder was intentional, that intent to kill could be "transferred" to Woods, even if the jury did not find that defendant or Michael intended to kill Woods.

¶ 44    We have reservations about this particular application of the transferred-intent doctrine, and we will say a word about that later. For now, our focus is on the facts of Knight's murder and the proof it supposedly yields of a specific intent to kill.

¶ 45    Knight was shot in the back—once, and from "distant range." That's all we know, and it doesn't move the needle on the issue of specific intent. This was not an execution-style shooting. Nor is there any evidence, for example, that Knight was shot in the back after fleeing the scene, with the shooter in dogged pursuit. And in fact there is evidence to the contrary.

¶ 46    As soon as the gunshots started, Woods testified, everyone ran "in the opposite direction" from defendant and Michael. Beyond that, all Woods knew is that Knight collapsed in an alley, a half a block away, with a bloody wound in his back. The evidence does not pin down when, exactly, he sustained that wound. It could have been the moment he turned to run, in which case the fatal shot was one of the bullets in Michael's indiscriminate gunfire. For what's it worth, Hunter said nothing about a chase or other scenario that might paint a different picture. And the surveillance video shows defendant and Michael heading back from the scene of the shooting in short order. We find it hard to believe that Michael, who shot Knight, had chased him anywhere.

¶ 47    Because the particular facts of Knight's murder, to the extent they are known, add little or nothing to the evidence of a specific intent to kill, a rational juror would still not be compelled to make that finding. Thus, a rational juror would not be compelled to "transfer" an intent to kill from Knight to Woods. The State's transferred-intent theory does not foreclose a lesser-included instruction on aggravated discharge.

¶ 48    To be clear, we are not taking issue with the principle that an intent to kill can rationally be inferred from the act of shooting a gun at someone and the surrounding circumstances. *E.g.*, *People v. Harris*, 2016 IL App (1st) 141744, ¶ 27, *rev'd on other grounds*, 2018 IL 121932; *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). Our point, a modest one, is that the inference is not inexorable; the act of shooting toward someone does not automatically or necessarily compel a finding of specific intent to kill.

¶ 49    If the inference was automatic, then every shot fired in the direction of a person would be an attempted murder. (Unless it kills someone.) But our Criminal Code includes the offenses of aggravated battery (with a firearm) and aggravated discharge of a firearm precisely because there are countless scenarios of this general sort in which a rational juror could find a lesser degree of culpability. 720 ILCS 5/12-3.05(e); 5/24-1.2 (West 2022). The State's overzealous view of this inference leaves little use for such offenses.

¶ 50    And this is no straw-man view of the State's position. It is exactly the implication of the State's rhetoric, in closing argument and on appeal, that Knight's death is the strongest possible evidence of a specific intent to kill him. (Of course it isn't.) This threatens to turn every murder into an intentional murder without further ado, thus leaving equally little use for the "strong probability" provision of the first-degree murder statute. 720 ILCS 5/9-1(a)(2) (West 2022).

¶ 51    It is commonplace to say that inferences about a defendant's mental state are best left to the jury. One consequence of this point is that the trial court usually should grant a request for a lesser-included instruction that differs from the charged offense only in its mental-state element. The rare exception to this general rule is where the more culpable mental state has been proven by direct and undisputed evidence. This is the guiding thought behind *Eubanks*, 2019 IL 123525, ¶¶ 74-81, where our supreme court granted a new trial on a first-degree murder conviction after the trial court denied a request for a reckless-homicide instruction. Our holding today breaks no new ground; it is just a simple application of *Eubanks* to a different set of offenses.

¶ 52    In sum, Woods was the uninjured victim of seemingly indiscriminate gunfire toward a group of people. There were few if any facts, beyond this conduct itself and a gang motive, on which to decide the question of specific intent. On *one* rational view of the evidence—and that's all defendant needs—Woods was the victim of an aggravated discharge. This "important third

option" (*Bryant*, 113 Ill. 2d at 502) should have been offered to the jury at defendant's request.

¶ 53    That ends our inquiry. Because the lesser-included instruction was warranted, defendant is entitled to a new trial on the attempted-murder charge. *Eubanks*, 2019 IL 123525, ¶¶ 77, 85. The fact that he was denied the instruction is all the prejudice, so to speak, that he must show. So we do not ask whether granting the lesser-included instruction would have changed the outcome of the trial. In posing this question, the State conflates the denial of a lesser-included instruction with the denial of an affirmative-defense instruction—and its principal citation proves the point. See *People v. Lewis*, 2015 IL App (1st) 122411, ¶¶ 67-71 (denial of self-defense instruction).

¶ 54    It is not for us to speculate about which of two competing rational verdicts the jury would have chosen. See *Eubanks*, 2019 IL 123525, ¶ 81 ("We will never know what this jury would have done if instructed on [the lesser included], as the court took that decision away from the jury."). Thus, we need not linger over the details of the State's own speculation. Our role is to ensure that the jury was instructed on all reasonable lesser-included offenses requested by the defense. It was not.

¶ 55    One final point. We do not deny, as defendant does, that the transferred-intent doctrine generally applies to the crime of attempted murder. *Edmondson*, 2018 IL App (1st) 151381, ¶ 65; *Harris*, 2016 IL App (1st) 141744, ¶ 29; *Ephraim*, 323 Ill. App. 3d at 1108-09; IPI Criminal 4th Nos. 6.05X, 6.07X (jury must find that defendant acted "with the intent to kill *an individual*") (emphasis added). But we are concerned that the doctrine, as applied by the State, has been cut loose from its underlying justification.

¶ 56    Which, put simply, is this: the fact that the actual victim of a defendant's conduct was not his intended victim has no bearing on his culpability. These are morally equivalent outcomes; the victims are equal in the eyes of the law. So the defendant should not be allowed to escape the full

measure of criminal liability on account of this happenstance.

¶ 57    Here, in contrast, the State would use the legal fiction of "transferred intent" to punish defendant *as if* he intended to kill *two* people (Knight and Woods) when, by hypothesis, he only intended to kill *one* (Knight). If defendant intended to kill them both, there would be no need to "transfer" any intent in the first place. There is a serious argument that applying the doctrine in this way would artificially inflate defendant's culpability and thus result in over-punishment.

¶ 58    But the issues here are complex. They have not been litigated in this case, either in the trial court or on appeal. And we can dispose of the case on narrower grounds. So that is what we have done. Should the question arise again, and find its way to us with adversarial presentation, there will be time enough to answer it then.

¶ 59    The trial court erred in denying defendant's request to instruct the jury on aggravated discharge of a firearm. Defendant's conviction for the attempted murder of Woods is vacated, and the case is remanded for a new trial on that charge.

¶ 60                                                II

¶ 61    While this case was pending in the trial court, the appellate court issued its opinion in *Bass*, 2019 IL App (1st) 160640, which held that an arrest based solely on the authority of a police-issued investigative alert, instead of a judicially issued arrest warrant, violates the search-and-seizure clause of the Illinois Constitution. Ill. Const. 1970, art. I, § 6. Since defendant was arrested on an investigative alert and not a warrant, he promptly moved to suppress any fruits of his arrest—above all, his custodial statement—under *Bass*'s newly announced rule. The trial court held a suppression hearing, found that there was probable cause for an arrest, and for this and other reasons, denied the motion to suppress. For the reasons given in the now-vacated portions of *Bass*, and reiterated in *People v. Smith*, 2022 IL App (1st) 190691, defendant argues

on appeal that the trial court's suppression ruling was error.

¶ 62    The legality of investigative alerts under our state constitution remains an open question, with conflicting precedents from the appellate court and, as of yet, no definitive resolution of the issue from our supreme court. But however the substantive question may ultimately be decided, we think this much is clear: the good-faith exception to the exclusionary rule applies to arrests that were made before any appellate precedent held this practice to be unconstitutional. *People v. Erwin*, 2023 IL App (1st) 200936, ¶ 49. And where the good-faith exception applies, a defendant is not entitled to the suppression of any evidence, even if his argument on the underlying point of constitutional law turns out to be correct. *Id.* ¶¶ 23-27.

¶ 63    Here, defendant was arrested in 2012, many years before *Bass* or *Smith*. Thus, the good-faith exception applies. We affirm the denial of the motion to suppress on this ground.

¶ 64    The parties dispute whether defendant has properly raised the alleged absence of probable cause as an independent constitutional challenge to his arrest. But these forfeiture arguments are much ado about nothing, since there clearly was probable cause to arrest defendant. More precisely, the investigative alert issued by Detective Alfini was supported by probable cause, and the arresting officers could rely on that alert, regardless of what they did or did not know about the matter themselves.

¶ 65    Briefly: when Detective Alfini issued the alert, Hunter had positively identified defendant as one of the shooters. McGinnis, the driver, and thus admittedly a participant in the offense in her own right, had named defendant as one of the two men who got out of her distinctive truck with a gun, even if she didn't claim to see the shooting that immediately ensued. A third witness, Deandre Williams, had also put defendant at the scene. And the witnesses' descriptions of the events were corroborated, so far as possible, by the surveillance video. There is no question that

this all adds up to probable cause.

¶ 66    The problem with defendant's probable-cause arguments is that they fail to take aim at the basis on which Detective Alfini issued the investigative alert; rather, they focus on what the arresting officers knew—or may have been led to believe, incorrectly or at least imprecisely— about the available evidence. These facts could make a difference if, as *Bass* and *Smith* held, the arresting officers could not simply rely on the investigative alert. But they could, so these facts establish nothing of consequence for defendant.

¶ 67    In other words, defendant's probable-cause arguments assume that *Bass* and *Smith* are correct. Thus, they fail to raise an independent (much less viable) challenge to the legality of his arrest based on the alleged absence of probable cause.

¶ 68    Because we affirm the denial of defendant's motion to suppress, his custodial statement, and any other evidence obtained as a result of his arrest, remain admissible on remand.

¶ 69                                CONCLUSION

¶ 70    For these reasons, we affirm defendant's conviction and sentence for first-degree murder; vacate his conviction and sentence for attempted murder; and remand the case to the circuit court for a new trial on the charge of attempted murder.

¶ 71    Affirmed in part; reversed in part; vacated and remanded.